**Andrew J. Dupay, Plaintiff-Appellee, v. The New York Central Railroad Company, a Corporation, Defendant-Appellant.**

**Gen. No. 52,655.**

First District, Fourth Division.

May 7, 1969.

Richard O. Olson, Alvin E. Domash, and James L. Daubach, of Chicago, for appellant.

James E. Harrington and John J. Naughton, of Chicago (Henslee, Monek & Henslee, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

The New York Central Railroad appeals from a judgment of $85,000 after a jury trial on plaintiff's claim for personal injuries under Title 45 USCA §§ 51–60, the Federal Employers' Liability Act. Plaintiff sued for injuries sustained while in defendant's Ashtabula, Ohio, Railroad Yard.

Defendant urges the following contentions in its appeal from the judgment: (1) the trial judge should not have instructed the jury that the plaintiff was in the course of his employment when the accident occurred be-

cause there was evidence in the record that plaintiff was intoxicated at the time; (2) evidence of plaintiff's past reputation for sobriety should have been excluded; (3) plaintiff's attorney improperly badgered, embarrassed and harassed defendant's witness Dr. McCarthy; (4) the plaintiff's attorney improperly commented upon the financial condition of defendant in his closing argument; and (5) the trial court committed numerous other errors that cumulated to deprive defendant of a fair trial. Defendant raises no question as to the amount of the judgment.

EVIDENCE

Testimony of Andrew J. Dupay, plaintiff:

He is 62 years old. Prior to the injury he was a yard brakeman (switching cars) for The New York Central Railroad Company (defendant), working in Ashtabula, Ohio. He started working with defendant in 1924 and received no training then. His duties as brakeman consisted of working with a crew cutting cars, throwing switches, classifying cars and diverting them to different tracks.

On May 3, 1961, he reported for duty at 2:45 for the 3:00 to 11:00 shift. His job that day was a highball assignment. He would have to climb a tower 20 to 22 feet off the ground and pass signals to the engineer as the crew passed the signals to him. He reported for duty by making out a time slip and then left the office and walked toward the highball stand which is south of the office. When he reached the top of the stand there were three or four cars yet to go past the switch, and Mr. Massey, who was working the left side, gave a swing down. The cars cleared Massey and stopped; Massey then gave a back away and the cars started moving toward the plaintiff.

As the cars were moving he developed a cramp. He then came down from the tower slowly. He could see that

the train was operating in a straight line so he started toward the yard office to pick up his finger mitt which he had left there. He had not intended to take any particular path to the yard office; there are many paths that can be used. He works in that area every day, and it is customary to come off the stand after signalling. As he crossed over to go north his legs gave out all of a sudden and he pitched forward toward the cars. He grabbed the sill steps of two different cars, and was dragged until he lost consciousness. His legs gave way because he stepped on some debris, pellet ore, fusee butts, limestone and other objects.

Pellet ore falls off cars in the yard. It comes in round pieces, like marbles, an inch or two inches in diameter. Fusee butts accumulate along the tracks when they are discarded after being used for signalling. The debris was there for a year or more before the accident. He had complained about it to the yardmaster and maintenance section foreman, probably two or three times in the six months prior to the accident. There were no changes in the area after the complaints.

When he regained consciousness he was in the Ashtabula General Hospital. He had been taken to the hospital by ambulance after the accident (which happened at 3:30 or 3:45). He was admitted and placed under the care of Dr. McCarthy.

When he arrived at the hospital he was sick from loss of blood and he had swallowed his snuff; he was chewing snuff at the time of the accident. He vomited in the emergency room of the hospital. The snuff was flavored with sherry and may have given off an alcoholic odor.

Testimony of Joseph R. Garvey, called by plaintiff as an adverse witness under section 60 of the Civil Practice Act, Ill Rev Stats 1967, c 110:

He is assistant general yardmaster, west yard tower. On May 3, 1961, he was general yardmaster at Ashtabula,

in charge of all yards. He was working in his office in the east end of the west yard when he was informed by telephone of plaintiff's accident. Plaintiff did not appear to be drunk; he did not observe any evidence of drinking on plaintiff's part. Plaintiff was quite a drinker when he first came to the railroad but he does not know of plaintiff having taken a drink in the past ten years. He did not observe any evidence of alcohol on plaintiff's breath in the emergency room.

The distance from the highball stand to the yard office is about 300 feet. There is no pathway between the two points. He does not recall finding any pellet ore in his examination of the area. He did not examine the highball stand at the time of the accident. He would expect to find some fusees under the highball stand. The fusees in the area of the tower are thrown to the ground by the highball man; he uses them to pass signals to crews switching from north to south.

There is an occasional maintenance program if there is an accumulation of fusees on the spot. Normally they are used all over the railroad and are discarded on the ground where they become part of the ground. He does not know what the maintenance program was on the day of the accident; he had just passed complaints along to the supervisor of track to take care of. There was a maintenance crew of a foreman and four men to take care of 40 miles of track. It was his obligation to see that conditions on the track were corrected. He did not receive any complaints about the track in the area of the accident in the year before it happened.

It was the custom and practice for signal men returning to the yard office to either walk or ride the engine; it was divided about half and half.

Prior to May 3, 1961, he saw crews cleaning up the yard from time to time. They would take a handcar along the leads and clean up debris, or they would take one

operating track and just go up the track and clean it. He inspected the yards personally prior to May 3, 1961. He would go to various places during the course of his everyday duties; if there was a bad condition, he would make a specific note and have it taken care of. He also makes a specific inspection tour every week.

Testimony of Donald Corlett, called by plaintiff:

He has been employed by defendant for 29 years. On May 3, 1961, he was working as yard conductor in the Harbor Yards on the second shift. When he reported for work that day, plaintiff was sitting outside the shanty. Plaintiff seemed normal. He did not observe any alcoholic beverages on plaintiff's breath. He was no more than three feet from plaintiff when they spoke.

There were a lot of fusee butts lying around where plaintiff was injured; there was also quite a lot of limestone lying around. The debris extended clear down to the yard office. That is representative of the ground conditions on May 3, 1961. There was pellet ore on the ground on the day of the accident.

He has occasionally worked as highball man and he has fallen a couple of times. He had made at least a half dozen complaints to the yardmaster about the debris prior to May 3, 1961; this was over a year and a half period. He noticed no change in the condition of the ground after those complaints. He cannot remember any major cleanup in the area of the highball stand and yard office prior to May 3, 1961.

He has never known plaintiff to take a drink for the last 20 or 25 years. He does not believe that plaintiff would work with someone "who had alcoholic beverages on his breath."

It is normal custom and practice for highball men to go back to the yard office when there is nothing to do. Sometimes they would ride the engine back. If they walked they would walk north or northeast.

151

Testimony of John D. Riddell, called by plaintiff:

He is now a security agent for Motor Fiber Company, but he was employed by defendant for 40 years. On May 3, 1961, he worked for defendant as a yardmaster on the 2:00 to 10:00 shift. He had two crews and a highball man working under him. The highball man was the plaintiff and he had been working at that job for a couple of months or more.

He was present when plaintiff reported for work and he observed plaintiff from approximately three feet. He thought plaintiff was normal. He was not close enough to smell plaintiff's breath but he did see plaintiff go about performing his duties.

He had worked in the yard a long time and was familiar with ground conditions and the area of the highball stand on May 3, 1961. There was stone, ore and fusee butts lying around the ground. He had received complaints about the ground conditions from employees prior to May 3, 1961. Some of these complaints were shortly before the accident. He would pass these complaints on to the general yardmaster. He did not notice any change in ground conditions. There was no specific maintenance program.

Testimony of Dr. William J. McCarthy, called by defendant:

He is an M.D. and was the doctor who first saw plaintiff in the emergency room of Ashtabula General Hospital. He was not then and never had been an employee of defendant.

An initial survey of plaintiff revealed a long laceration of the left groin; there was considerable venous bleeding. It did not appear that the bleeding was femoral or arterial. He then evaluated the plaintiff. He called the police to take a balloon test of plaintiff because of plaintiff's demeanor but he refused to take the test.

He thought plaintiff was intoxicated because of the way in which plaintiff acted; he wanted to be left alone; he had a foul odor on his breath; his eyes revealed a small pupil which reacted to light and accommodation; and he wanted to turn on his side and go to sleep.

There were X rays taken of the skull which revealed a possible fracture of the skull. The patient was in shock when he was admitted to the hospital but the doctor did not mistake shock symptoms for those of intoxication. There was a foul odor on plaintiff's breath that was not halitosis. He could not identify the odor as to beer, wine or whiskey; and he did know that plaintiff chewed snuff.

## OPINION

Under the Federal Employers' Liability Act (Title 45 USCA § 51) every common carrier by railroad while engaging in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce." Defendant first argues that plaintiff was not in the course of his employment when injured and that the trial judge improperly instructed the jury that "[a]t the time of this occurrence the Plaintiff was in the course of his employment." It is not disputed that plaintiff had performed the tasks required of him including walking to the highball stand, climbing the 20 feet to the top of the stand, passing signals to the switching crew, climbing down the 20 feet, and that he was properly, in accordance with custom and practice, returning to the yard office. The entire thrust of defendant's argument is that plaintiff was drunk and therefore was not within the scope of his employment at the time of the accident. Defendant argues that the alleged drunkenness at least creates a jury question as to whether plaintiff was within the scope and course of his employment.

■ The defendant offers no citation in support of this novel proposition, and we hold that the judge properly instructed the jury that plaintiff was in the course of his employment. The Federal Employers' Liability Act allows reduction of damages through proof of contributory negligence on the part of the employee. Certainly intoxication would bear on any issue of contributory negligence and thus affect the amount of damages, and defendant could have elected to pursue that course; however, defendant chose to seek a complete defense to the action and in its reply brief specifically waived the issue of contributory negligence. We find no error in the giving of the instruction to the jury.

Since we have decided that plaintiff's alleged intoxication has no bearing on whether he was in the course of his employment, and since defendant has waived any contributory negligence which might have reduced damages, there is no issue upon which the evidence of intoxication or sobriety can any longer be relevant; thus we will not consider any contentions on appeal concerning such evidence.

■ ■ Defendant next argues that the trial judge improperly overruled defendant's objection to a statement in the closing argument of plaintiff's counsel to the effect that defendant corporation "can afford and does afford very capable attorneys . . . ." It is well established that counsel should refrain from comment on the financial circumstances of the parties to any litigation and certainly should not emphasize the wealth of any litigant even though that wealth is common knowledge. Wellner v. New York Life Ins. Co., 331 Ill App 360, 366, 73 NE2d 156; Chicago Traction Union v. Lauth, 216 Ill 176, 74 NE 738; Panelle v. Chicago Transit Authority, 31 Ill2d 560, 202 NE2d 484. However, the comment complained of in the instant case is only a very brief allusion to the wealth of the defendant, and one of defendant's own witnesses, Dr. McCarthy, also mentioned defendant's large size.

154

We cannot find that defendant was prejudiced by the improper comment.

Defendant has cited Wellner v. New York Life Ins. Co., supra, to support his contention that the comment alluding to defendant's wealth requires a new trial. However, close examination of Wellner reveals that the case was remanded on other grounds and that the discussion of closing argument was for the guidance of the judge who would conduct the new trial.

 Finally defendant argues that the trial court committed numerous other errors which cumulate to deprive defendant of its right to a fair trial. Defendant alleges nine such errors. Having examined the nine instances of alleged error we find that we cannot consider three of them due to the failure of defense counsel to object at trial. In the six remaining instances we find no prejudicial errors, individually or cumulatively.

Defendant's sole witness, Dr. McCarthy, was questioned only about the physical condition of plaintiff; there was no testimony by defendant to rebut plaintiff's evidence as to the debris in the yard and no issue is raised as to the amount of the judgment. We believe defendant had a fair trial.

The judgment of the Circuit Court is affirmed.

Affirmed.

McNAMARA and STAMOS, JJ., concur.