JOSEPHINE M. MOYNIHAN, Plaintiff-Appellee, *v.* JOHN JOSEPH MOYNIHAN, Defendant-Appellant.

(No. 56975; ▮▮▮▮▮▮▮▮)

First District—November 17, 1972.

*Modified upon denial of rehearing January 23, 1973.*

John J. Moynihan, *pro se.*

Gomberg and Sharfman, Ltd., of Chicago, (Phyllis Chipman, Robert J. Sharfman, and David L. Gomberg, of counsel,) for appellee.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Defendant appeals from a judgment of divorce entered in favor of plaintiff. The court found that the defendant was guilty of extreme and repeated acts of mental cruelty which were unprovoked by the plaintiff. The proceedings below took place in two "phases." The "first phase" concerned the issue of the parties' marital status, that is, whether plaintiff should be granted a divorce. The "second phase," which ensued after

the court found that plaintiff was entitled to a divorce, concerned. the property settlement and culminated in an "Additional Judgment," setting forth the terms of the settlement.

On appeal the defendant (whose brief is written *pro se*) contends (1) that the judgment of the court granting the divorce was against the manifest weight of the evidence; (2) that the court erred in questioning plaintiff and plaintiff's witnesses and the manner in which he questioned them; (3) that the court erred in permitting two lay witnesses to testify as to "medical and pharmacological details"; (4) that the court erred in refusing to inform defendant of the basis upon which the judgment for divorce was granted; and (5) the court erred in denying defendant the right to cross-examine plaintiff regarding a certain letter she had written and which defendant argues shows that her testimony was perjured.

No issue is raised on appeal concerning the property settlement.

At trial, as on appeal, defendant appeared *pro se* despite repeated requests by the trial court that he obtain the services of an attorney. Defendant is a professional consulting engineer and worked at the time of trial as an independent contractor. Defendant stated that he could not afford to retain an attorney but felt that he could adequately represent himself.

Prior to the "first phase" of the trial, the following colloquy took place between the defendant and the trial judge:

"THE COURT: Mr. Moynihan, it is the understanding of this court that you do not want to offer any defense with reference to the complaint, which related to the mental cruelty and the only issue you desire the court to determine is the allowance for the minor child or your wife as the case may be; is that correct?

DEFENDANT: Yes."

The "first phase" of the trial proceeded and the relevant facts follow.

Plaintiff, Josephine Moynihan, testified in her own behalf. She and the defendant have three children, only one of whom (Margaret) is still a minor. During her marriage with defendant she treated him well, but "he [defendant] was irresponsible in the things he should do, providing for his family and wife." They communicated very little during the past three years; during this time no conversation between them lasted over 60 seconds. She had been the "breadwinner" for the family for the past five years. The defendant had refused to sign certain forms regarding an application for financial aid for college for their daughter Margaret. When asked if the circumstances as to which she was testifying (*i.e.*, her having to support the family, both financially and emotionally, and her general marital relationship with the defendant) were known to her

friends, she answered, "Yes." As a result of these circumstances she has become nervous and upset and sought medical attention.

The court proceeded to question her without objection by defendant. She was asked to describe the alleged mental cruelty in greater detail. She responded:

> "The constraint between us [is] because of the fact I cannot depend on anything and the fact that it has been up to me to hold this family together, has interfered with my sleep, my activities during the day, and a result of chronic hypertension."

Defendant was giving her minor child (Margaret) little supervision over the last several years and plaintiff was in effect raising the child. She and defendant have not slept in the same bedroom since 1967, four years ago. Defendant failed to contribute regularly to the finances of the family because he was employed only sporadically. Plaintiff would talk to him about his failure to gain regular employment and defendant would respond that "he was looking for work." She felt that defendant was making less than a good faith attempt to seek regular employment. He kept irregular hours that disrupted the marriage. As plaintiff stated:

> "He went out at night. He rarely called. He would come in late. Dinner was prepared. I didn't know whether he was going to be there or not."

Defendant earned $10,000 during 1970 and turned it all over to plaintiff. In 1969 he worked part of the year and made roughly $7000 all of which he turned over to plaintiff. During 1971 he had not contributed anything to the family's support, except for sums ordered by the court during the preliminary stages of this lawsuit. He has never abused plaintiff physically. The court then asked plaintiff whether in essence she had been living in the apartment, leading her own life while supervising Margaret and the other children (when they were minors), and the defendant had been living there by himself. She responded, "Yes." The marital problems have affected her health. She has high blood pressure, difficulty sleeping at night which "destroys" her next day. She has headaches and other pains which have become intensified during the past three or four years. She has been given medication for her problems. The court asked her if the medication was in the form of "nerve pills, tranquilizers," and she responded, "Yes." She feels that due to the actions and inactions of the defendant, the marriage has been destroyed with no possibility of reconciliation.

Michael Moynihan, a son of the parties, testified for the plaintiff. The record does not indicate his exact age but it does reveal that he is at least 22 years old. He now lives and works in Jessup, Maryland, but he did live with his parents during the past several years. He characterized

his mother's conduct toward his father as follows: "It was a constant battle to keep her head above water and try to get him to aid." Plaintiff constantly requested that the defendant seek regular employment. Michael has never seen his parents converse for more than a minute at a time during the past four years; they have lived in separate bedrooms during this period. He enlisted in the navy after high school to avoid the turmoil at home. He has seen his mother take pills which were prescribed by her doctor. He has asked her what they were for and he believed she said, "high blood pressure." "She [plaintiff] tried to keep it [the hostility in the house] as hidden as much as possible." On cross-examination by defendant, Michael stated that he believed there was no possibility of a reconciliation between his parents.

The court proceeded to question Michael without objection by the defendant. Michael then testified that his father left "the raising" of the children to his mother; his father didn't communicate with anyone in the family; he often saw his mother cry when an argument occurred; his mother would often be depressed after these arguments; she complained to him about headaches and nervousness. He was of the opinion, based upon his own observations, that his father's actions and inactions were responsible for his mother's emotional condition. After the court concluded its questioning, defendant was asked if he had any further questions. He responded, "No. I think Mike has summed up the situation pretty accurately."

Margaret Moynihan, daughter of the parties, testified for the plaintiff. She is a college student. She in essence corroborated the testimony of both the plaintiff and Michael. She was then questioned by the court, again without objection by defendant, and described the situation at home as follows:

> "They rarely talked with each other. It sounds strange, but it is true. During dinner, nobody had much to say. It was such a strange atmosphere. I remember the arguments. I can't say how many. They frighten even me."

The court asked if the defendant had any further questions for the witness, and defendant responded, "I think that covers that phase of it."

Plaintiff had other witnesses to testify in her behalf, but they were not called because defendant did not wish to present any defense, as he stated, "to the divorce phase of it insofar as it affects the witnesses who have already testified."

The court then stated:

> "The court is well aware of the fact that you [plaintiff] have these additional witnesses. In view of defendant's comment, with reference to his desire not to put in a defense as far as the divorce

phase of this case is concerned, do you have any observations with reference to these witnesses  *  *  *."

Plaintiff's counsel responded that he did not.

The defendant presented no defense. Neither plaintiff's counsel nor defendant wished to make a final argument. The court then stated:

"Based upon the evidence before the court, a divorce is granted to [plaintiff]  *  *  *  on the grounds of mental cruelty."

The "second phase" of the trial, that dealing with the property settlement and alimony, was begun the next day (August 3, 1971). On August 20, when the judgment of divorce was to be entered, defendant told the court that he did not think he had acquiesced to an entry of judgment on the "divorce phase" of the case. He denied stating that he wished to present no defense to the "divorce phase" of the case. He stated:

"I am in agreement that a divorce has to be granted and I am still much more in agreement today but I am not in agreement that a divorce has to be granted with me as the defendant being found guilty of practices charged by plaintiff. I am in the unfortunate position of not being able to put in a counter-suit for divorce."

The court responded that the record was clear that the case would be handled in two stages and that defendant had agreed to present no defense to the "divorce phase" of the suit.

*Opinion*

Defendant first contends that the judgment of divorce was contrary to the manifest weight of the evidence. We disagree. It is stated at 24 Am. Jur. 2d, Divorce and Separation, § 36, at page 206:

"The question whether the misconduct complained of constitutes cruelty and the like for divorce purposes is determined primarily by its effect upon the particular person complaining of the acts. The question is not whether the conduct would be cruel to a reasonable person or a person of average or normal sensibilities, but whether it would have that effect upon the aggrieved spouse. That which may be cruel to one person may be laughed off by another, and what may not be cruel to an individual under one set of circumstances may be extreme cruelty under another set of circumstances."

As noted in *Stanard v. Stanard*, 108 Ill.App.2d 240, 247 N.E.2d 438, the conduct of the husband (in this case) must have been such that it would necessarily and inevitably have caused the aggrieved person's (plaintiff's here) health to be endangered or to render her life miserable and unendurable.

Plaintiff has suffered increased nervous anxiety arising from defendant's actions and inactions over the past several years. Little if any communication takes place between the two parties. Plaintiff has been, in effect, the sole source of guidance for the children. She has required the assistance of tranquilizers to aid her in going to sleep at night and generally in coping with the family situation and her everyday affairs. The two children who testified totally corroborated her testimony as to the increasing anguish she has suffered over the past several years. Furthermore, defendant did not dispute any of the testimony that was presented. Rather, he acknowledged its truth as evidenced by his remark to the court after his son Michael had testified. He told the court, "I think Mike has summed up the situation pretty accurately."

■■ In *Woodshank v. Woodshank,* 2 Ill.App.3d 596, 599, 274 N.E.2d 694, the court noted that whether a certain course of conduct has such a detrimental effect upon the plaintiff and the marriage is a question of fact. We feel that the undisputed facts, set forth earlier, support the court's finding that the defendant was guilty of repeated acts of mental cruelty as alleged in the complaint.

We also note that the record supports the trial court's statements that defendant agreed to have the case tried in two phases (the first regarding the parties' marital status and the second regarding the property settlement) and that the defendant literally agreed not to contest the "divorce phase" or the "first phase" of the trial. The judge explicitly asked defendant if he approved of trying the case in this manner and defendant, a well educated man as evidenced by the fact that he is a professional consulting engineer and also by the excellent manner in which he has briefed this case, *pro se,* on appeal, stated that this was fine with him.

Defendant has urged that the proof submitted does not relate to any of the allegations in the complaint. But paragraph seven therein alleges:

> "That the defendant refuses to assist, help, guide or aid in raising any of the children of the parties and does nothing except reside in a separate bedroom in the premises jointly occupied by the plaintiff herein and that said course of conduct on behalf and on the part of the defendant has resulted in plaintiff being made more nervous and irritable and having to seek medical consultation and advice and being placed upon a program of tranquilizing drugs and examinations."

As noted, the proof relating to these allegations was unequivocal.

■■ Defendant's second contention is that the court erred in questioning plaintiff and the two children and also erred in the "leading manner" in which he questioned them. Defendant never objected to any question

posed by the court to any of the witnesses and we could dismiss this contention on this ground. (*Dupay v. New York Cent. R. Co.*, 110 Ill. App.2d 146, 155, 249 N.E.2d 179.) However, the record shows that the court questioned the witnesses in an honest effort to elicit information pertaining to the present condition of the marriage as it had evolved over the past several years. The questions were not biased in any way and sought merely to substantiate what had been brought out during the questioning of these witnesses by plaintiff's counsel. We see no error in the actions of the court nor do we see that defendant was prejudiced by the court's questions in any way. See *People v. Tyner*, 30 Ill.2d 101, 104, 195 N.E.2d 675.

■■ Defendant's third contention is that the court erred in permitting the two children to testify that plaintiff was taking tranquilizers for her nervous condition (general anxiety, sleeplessness). This testimony merely corroborates the testimony already given by plaintiff. It was given without objection by defendant. Both children had seen plaintiff take pills. Michael stated that plaintiff had told him the pills were for high blood pressure. Margaret stated that she "knew" the pills were for "high blood pressure, sleeping and hormones"; that the marital strife of the parties had caused her mother's unendurable condition. The trial judge was well aware that these "children" (Michael was at least 22 years old and Margaret was a college student) were not expert witnesses. We do not believe he considered their statements as expert testimony but merely as corroboration of what the plaintiff had already testified to.

Defendant's fourth contention is that the trial court erred in failing to inform defendant as to the grounds upon which the judgment for divorce was granted. We disagree with defendant's contention because the judgment for divorce itself sets forth the reasons for the trial court's decision. It states that the divorce was granted because plaintiff had proved all the allegations in her complaint except for the portion dealing with the failure to support the family.

Defendant's final contention is that the court erred in failing to allow him to cross-examine plaintiff as to a letter she had written before trial which contained a report of the alleged net worth of the family as of March 17, 1971. The letter stated the net worth to be $1086. During the "second phase" of the trial plaintiff gave a full account of every asset that belonged to her. There was a discrepancy between the amount quoted in the letter and the assets she described in court. The main discrepancy arose from plaintiff's failure to list in her letter assets in joint accounts which were gifts from her mother. All discrepancies were fully presented to the trier of fact. Defendant's cross-examination of plaintiff on the issue was not impeded by the court in any way. In fact the judge

elicited much of the information concerning her financial interests. Any inconsistency presented went only to the issue of plaintiff's credibility. It did not discredit her entire testimony as argued by defendant on appeal.

The decision of the circuit court is affirmed.

Judgment affirmed.

LORENZ, P. J., and ENGLISH, J., concur.