*In re* MARRIAGE OF MARY EILEEN YAKIN, Petitioner-Appellee, and
PAUL M. YAKIN, Respondent-Appellant.

First District (5th Division)    Nos. 81-0823, 81-1266 cons.

Opinion filed May 7, 1982.—Rehearing denied June 22, 1982.

Genaro Lara, of Chicago, for appellant.

Michael W. Kalcheim and Ilene E. Shapiro, both of Kalcheim & Kalcheim, Ltd., of Chicago, for appellee.

JUSTICE WILSON delivered the opinion of the court:

Respondent appeals from a judgment of dissolution entered in favor of petitioner. The court found that respondent was guilty of extreme and repeated acts of mental cruelty, extreme and repeated physical cruelty, and constructive desertion. The court further awarded custody of two minor children to the petitioner, awarded the marital residence to the petitioner subject to a lien of $5,000 in favor of respondent and assessed attorney fees in favor of petitioner's attorney in the amount of $12,000.

Respondent contends that (1) the judgment of the court granting the divorce was against the manifest weight of the evidence; (2) the court erred in permitting the trial to proceed while respondent was absent; (3) the court erred in awarding custody of the minor children to petitioner and (4) the court erred in awarding attorney fees to petitioner's attorney in the amount of $12,000. No issue is raised on appeal concerning the award of the marital residence to petitioner. For the reasons hereinafter stated we affirm the trial court as to the granting of petitioner's petition on grounds of mental cruelty, physical cruelty, and constructive desertion but reduce the court's award of attorney fees. The relevant facts on the contested grounds of the petition follow.

Petitioner, Mary Eileen Yakin, filed her petition for dissolution of marriage on January 5, 1979. During the following 1½ years several preliminary motions and petitions were brought on behalf of both parties and discovery was conducted. On April 27, 1979, pursuant to petition of

respondent, Paul M. Yakin, an agreed order was entered by the court requiring both parties to submit to a mental examination by a court-appointed psychiatrist and reserving the issue of submitting the children for a mental examination. Ilse Judas, M.D., was suggested by the court because she was a specialist in the field of child psychiatry. She was approved by both parties and during late May and early June, she interviewed each of the parties and the two minor children. She conferred with petitioner on two occasions totalling 1 hour and 55 minutes. She also saw respondent on two separate occasions, totalling 2 hours and 10 minutes. At another session, she observed the whole family interact together and spoke to each of the children individually for approximately 30 minutes each. Upon completing her examination, on June 5 she prepared a written report recommending that petitioner be awarded the permanent custody of the parties' two minor children. This report was submitted to the attorneys for both parties but was not filed with the court. On September 20, 1980, the attorney for respondent deposed Dr. Judas pursuant to order of the court and subpoena. On June 29, 1979, pursuant to petition of respondent for a supportive services investigation, the court entered an agreed order authorizing an investigation by the Department of Supportive Services. Sharon Zingery was the caseworker assigned to conduct the investigation. She visited with each of the parties in their respective homes and observed the parties' interaction with the two minor children. On December 10, 1979, she prepared a written report which was sent to the attorneys for both parties. In that report she recommended that permanent custody of the two minor children be awarded to petitioner.

On December 11, 1979, the first phase of the trial proceeded as a contested trial as to the grounds for dissolution of marriage. After petitioner began to testify in her own behalf, the court conducted conferences with counsel and the parties in chambers. Respondent and his attorney stated at these conferences that respondent was opposed to a divorce and wished to participate in marriage counselling with petitioner. The trial then was suspended and, on January 28, 1980, the parties entered into a written stipulation, which was filed on February 1, 1980. The stipulation contained, among other things, the following provisions: (1) the parties would participate in counselling by Melvin N. Seglin, M.D., a court-appointed psychiatrist; (2) Dr. Seglin would render an opinion as to whether the parties' marriage was nonviable and whether their differences were irreconcilable; (3) the parties agreed to be bound by the recommendations of Dr. Seglin as to these issues; (4) in the event that Dr. Seglin found that the marriage was nonviable, or that there existed irreconcilable differences, the parties agreed that the document would

serve as a stipulation to prove up the case as if it were an uncontested default matter, with the grounds being willful and constructive desertion on the part of respondent, without any cause for provocation on the part of the petitioner, and that the permanent custody of the parties' two minor children would be awarded to petitioner; and (5) in the event that Dr. Seglin found the marriage nonviable, or that there existed irreconcilable differences, respondent would not put on a defense as to ground or custody. Both parties testified in open court as to the terms of the written stipulation and as to their voluntariness in entering into it without coercion from any party or the court.

Both parties were seen by Dr. Seglin on a weekly basis in a series of psychiatric interviews from approximately February 11, 1980, through May 1, 1980. Dr. Seglin prepared a written psychiatric summary which was tendered to counsel for both parties and to the court. He stated in the summary:

> "It appears that the situation has gone beyond 'the point of no return' and an attempt at reconciliation at this time would be fruitless. I will offer one further recommendation in the event that the divorce is decreed. I see no reason why custody of the children should not be granted to Mrs. Yakin."

After receipt of Dr. Seglin's report, petitioner filed a petition requesting a prove-up date to allow the case to proceed pursuant to the parties' written stipulation. In response thereto respondent filed a petition requesting that the parties' written stipulation be withdrawn, based on public policy and various constitutional arguments. The trial court, on August 13, 1980, entered an order which provided that the stipulation heretofore entered would be rescinded, provided that respondent pay petitioner for the attorney fees that were specifically incurred in connection with the stipulation.

The trial on the grounds of dissolution was reset, continued from time to time and eventually recommenced on January 21, 1981.

This opinion will not be unduly extended at this point by cataloguing each of the instances identified by petitioner in support of her petition for dissolution; when appropriate, the operative facts supporting the grounds for dissolution will be detailed. The record supports the conclusions that respondent privately and publicly insulted his wife, was guilty of physical cruelty, physical abuse, psychological harassment toward plaintiff and also humiliated her before family, friends and strangers. Following the testimony of witnesses called on behalf of both parties, the court entered a judgment of dissolution based on respondent's mental cruelty, physical cruelty and constructive desertion. The court's ruling was issued on January 23, 1981. Following the court's ruling a trial date on custody and

financial issues was set for February 24, 1981. One week prior to the scheduled trial date on custody and financial issues, respondent filed a motion for substitution of attorneys and Attorney Genaro Lara substituted for respondent's former counsel. After hearing testimony of witnesses, the court found that petitioner was entitled to the permanent care, custody and control of the parties' two minor children. She was awarded the marital residence, subject to a lien in favor of respondent in the amount of $5,000. The judgment of dissolution of marriage was entered on March 13, 1981, and the issue of attorney fees was taken up in a separate hearing. Hearing commenced on the issue of attorney fees on April 29, 1981, and on May 6, 1981, an order was entered assessing attorney fees in favor of petitioner's attorneys in the amount of $12,000.

Respondent filed his notice of appeal from the judgment of dissolution of marriage on April 2, 1981, and the notice of appeal was amended on April 15, 1981. On May 20, 1981, respondent filed notice of appeal on the order of attorney fees. Case No. 81-823 concerning the judgment for dissolution of marriage and No. 81-1266 on the issue of attorney fees were consolidated on July 10, 1981, by order of this court.

OPINION

I

Respondent-appellant argues that the acts of which petitioner complains did not comprise a course of conduct sufficient to rise to the level of extreme and repeated mental cruelty; that petitioner's proofs failed to establish that these facts resulted in an adverse effect upon her physical or mental health; that petitioner's case lacked the requisite proof demonstrating an absence of provocation on petitioner's part with respect to the acts in question; that petitioner's proofs failed to establish extreme and repeated cruelty; that petitioner's proofs failed to establish constructive desertion and that petitioner failed to prove lack of provocation on her part in regard to extreme and repeated cruelty and constructive desertion. We disagree. The record reveals the following:

Petitioner testified that respondent accused her of trapping him and forcing him into the marriage. He told her that he never loved her and that he no longer wished to be married to her. He accused her of destroying his life and of strapping him down with responsibilities and obligations; he accused her of intentionally becoming pregnant, in order to force him to stay in the marriage; and he called her a bitch and told her that the most important thing in his life was his work; that she and the child were mere "clutter." She further testified that when she became pregnant and went into labor with her first child he complained about driving her to the hospital and after her delivery, refused to visit her in the hospital. On

numerous occasions he told her that he considered her ugly or vaguely attractive only when she wore makeup; that she looked like a little girl and that he found her repulsive. He also frequently told her that she was immature, strange, abnormal and neurotic. Although she prepared meals on a daily basis, he told her that he refused to be obligated to her time schedule for meals and that he refused to sit down and eat meals with her and the children. Instead he would eat alone in a separate room of their apartment. Despite her protests he would spend very little time with her and the children; he spent the majority of his time on his studies and on lawsuits he planned to file against his former psychiatrist and against his former graduate school. He told her that he needed to achieve his revenge by filing these lawsuits, in order to assert his manhood. Once he pushed her and slapped her face in a public courtroom. When she attended various parties with him and his school or business associates, he criticized her for talking too much, being too spontaneous, revealing too much about herself, behaving immaturely, showing neuroticism, revealing her stupidity and ignorance and behaving too seductively toward other men. He also accused her of being a whore, having sexual relations with her psychiatrist, a man who is 78 years of age, and of getting his professional services in exchange for sexual favors.

He told her that her psychiatrist was making her sicker. Petitioner further testified that she found a "stream of consciousness" diary written by her husband, in which he stated that he enjoyed hurting her and seeing her cry, and that it gave him a great sense of power. In April of 1977 she consulted with an attorney regarding a divorce. When she advised respondent of this he slapped her in the face and called her a bitch and a whore. Also, he threatened to destroy her and the children and said that she was going to die as his wife. In May of 1978 she asked him for time off from sexual relations. In response to this request, he pushed a washing machine against her hip, bruising her and then threatened to rape her. He went into another room and began throwing furniture. She separated from him after this incident but later reconciled. After reconciling she went, at his request, to a psychiatrist selected by him for marriage counselling. During a joint counselling session he stated to the psychiatrist that she was the sickest person he had ever met and that she was incredibly hard to live with.

She further testified that there had been moments of affection during the marriage, but that those moments were rare. In addition, she testified that after the altercations aforementioned, he would refuse to talk to her, and there would be periods of silence, sometimes as long as two days. Further, she said that on repeated occasions, when she would ask him to sit down and discuss the marriage in order to work things out, he would refuse to answer. During the month of December 1978 there was no

communication between the parties and in late December or early January 1979, she left the marital home with the two minor children and filed the dissolution proceedings.

Finally, petitioner testified that as a result of the respondent's conduct, she suffered crying spells, shaking, extreme nervousness, heart palpitations, insomnia, restlessness, shock, alternating nausea and constipation, headaches, dizziness, feelings of frustration, bewilderment, humiliation, hopelessness and deep hurt. She also testified that on the occasions that respondent struck her, pushed her and pushed the washing machine into her, she suffered from pain, bruises and red marks.

Dr. James Alexander, psychoanalytic psychiatrist, testified on behalf of petitioner. He testified that he had seen petitioner professionally on a regular basis from 1975 through 1980. He had discussed her marriage with her on a number of occasions and summarized his conclusions by stating:

> "Well, she was, she was very unhappy, under continuous emotional distress; and that was evident by obsessive worry about it, preoccupation with it, tears, despairing feelings, often feeling hopeless to cope with the stress of the marriage, the conflict."

He further testified that petitioner told him that respondent had a depreciating, high tempered and contemptuous attitude toward her. Dr. Alexander also testified that he thought that petitioner's physical health was sound, although the emotional stress caused her to often feel exhausted and agitated. He had observed her emotional condition to be anxious, worried and distressed. He further observed that she cried a lot and felt trapped and hopeless. In his opinion, petitioner's emotional problems were largely situational and related to her husband's attitude toward her and treatment of her. He also testified that three days prior to the trial, he had received a threatening telephone call from respondent who accused him of ruining his marriage and going against his wishes by continuing to treat his wife.

On cross-examination, Dr. Alexander testified that respondent had been his patient prior to petitioner becoming his patient and he had seen respondent individually for six months on a weekly basis; that respondent was very disturbed because he was on the verge of being expelled from the graduate school's doctoral program and because of litigation he had brought against his previous psychiatrist; that respondent had discussed his wife's emotional problems and attributed them to her relationship with her family. When Dr. Alexander was asked by petitioner's attorney as to the reason that he had treated petitioner free of charge for many years, he responded that if he had not treated her she would have regressed, collapsed in such despair that she would have "taken her life."

On redirect examination Dr. Alexander testified that he had observed the parties during joint sessions and noticed that respondent treated

petitioner in an ill-tempered manner. Further, he observed that petitioner resented this type of treatment but that she would behave submissively. In his opinion, respondent is an angry, vengeful, and litigious man with some paranoidal tendencies.

After Dr. Alexander finished his testimony the petitioner rested her case and respondent made a motion for a directed finding which was denied by the court. Petitioner then moved to amend her complaint to add desertion and physical cruelty as grounds in addition to the originally pleaded grounds of mental cruelty. The motion was allowed.

Respondent took the stand and testified in his own behalf. Respondent testified that he never struck petitioner and that he never used foul language. He denied that his conduct forced petitioner to leave home and testified that his wife showed evidence of emotional problems stemming from mistreatment by her family and from her experience as a nun. Further, he stated that during the first two years of their marriage, when his wife became upset, she would take as many as four sleeping pills.

On cross-examination, respondent testified that he never took petitioner to the hospital after the incidents when she took three or four sleeping pills.

In *Morris v. Morris* (1979), 70 Ill. App. 3d 125, 388 N.E.2d 129, this court upheld a finding of mental cruelty in a case closely.paralleling the facts of the pending case. In *Morris* the record revealed that on two occasions defendant physically struck plaintiff, knocking her down. He often shouted abusively at her, sometimes in the presence of others; he told her that he wished he weren't married to her and didn't love her; and he related intimate details of their marriage on the telephone to an unidentified listener. Further, he refused to help her maintain the household when she was ill and verbally abused her for asking him for aid because he believed she was "faking illness." He demanded that she turn over to him all of the money or other assets she possessed, for his control and use, or else he would declare "war" upon her, sue her for divorce and cause her to expend all of her funds on attorney fees and cost of litigation. Such conduct caused her to experience shock, fear, nervousness, depression, anxiety, loss of weight, crying, nausea, and feelings of abandonment and despair. The *Morris* court held that defendant's behavior was causally connected to plaintiff's symptoms and affirmed the trial court's granting of the divorce. (See *McCarrel v. McCarrel* (1977), 48 Ill. App. 3d 666, 363 N.E.2d 198; *Rosenbaum v. Rosenbaum* (1976), 38 Ill. App. 3d 1, 349 N.E.2d 73; *Christian v. Christian* (1979), 69 Ill. App. 3d 450, 387 N.E.2d 1254.) In *Christian*, we held that to constitute cruelty grounds, respondent's conduct must have caused the petitioner embarrassment, humiliation and anguish which rendered her life miserable and unendurable. More-

over, in *Rosenbaum,* this court found that the ultimate test is whether the conduct complained of had the required adverse effect upon the physical or mental health of the complaining party.

Applying these principles to the case at bar, we conclude that the evidence adduced at the trial of this case amply supports the judgment dissolving the marriage on the grounds of respondent's mental cruelty.

Respondent urges, however, that petitioner failed to prove her lack of provocation, and he seeks reversal upon this contention. Proof of lack of provocation is an essential part of plaintiff's case and respondent is not required to plead or prove it as an affirmative defense. (*Hecht v.Hecht* (1977), 49 Ill. App. 3d 334, 364 N.E.2d 330.) In *Hecht,* however, the court clarifies this issue as follows (49 Ill. App. 3d 334, 340):

> "While the burden of proving lack of provocation remains at all times with the complaining party, the burden of going forward shifts to the defending party once there has been a denial, explicit or implicit * * * that the actions were provoked. This is true even if the defending party has denied in the answer that the actions were not provoked."

■■ Applying this principle to the facts before us, we find that petitioner denied that she provoked respondent's conduct and the burden of introducing contrary evidence shifted to him. Further, throughout petitioner's testimony there is a sense of her shock, anger and incomprehension in the face of defendant's behavior toward her. Her sense of bewilderment suggests that she had given respondent no cause of provocation for committing the acts that he committed. See *Moynihan v. Moynihan* (1972), 9 Ill. App. 3d 520, 292 N.E.2d 105.

Respondent's reliance on *Stanard v. Stanard* (1969), 108 Ill. App. 2d 240, 247 N.E.2d 438, is misplaced because in that case there was positive evidence of petitioner's provocation. In the pending case, however, evidence of provocation is only conflicting; the trier of fact resolved it in favor of petitioner. Respondent also seeks support from *Gregory v. Gregory* (1974), 24 Ill. App. 3d 436, 321 N.E.2d 122; however, in that case the court noted a total absence of evidence in regard to lack of provocation, unlike the situation in the present case.

■■ Respondent also argues that petitioner's testimony was not corroborated by other evidence, and consequently the grounds for dissolution were not sufficiently proved. This position is without merit. There is no rule requiring corroboration in a case such as this, and if her testimony is sufficiently credible in the light of opposing evidence, the court may accept it along with other credible evidence and enter a judgment. (*Surratt v. Surratt* (1957), 12 Ill. 2d 21, 145 N.E.2d 594; *Morris v. Morris* (1979), 70 Ill. App. 3d 125, 388 N.E.2d 129.) Here, her testimony

concerning mental cruelty is sufficiently credible in the light of all of the evidence to warrant acceptance by a reasonable person.

Furthermore, we conclude that there was sufficient evidence to prove the grounds of extreme and repeated physical cruelty as well as constructive desertion.

## II

Respondent next posits that the trial court committed an abuse of discretion in commencing trial in respondent's absence, which was due to medical reasons. Specifically, respondent maintains that commencement of the February 24, 1981, hearing in his absence was an infringement of his due process rights. Also he claims that this action by the trial court was indicative of the court's prejudicial attitude against him. We are not persuaded by this argument.

■■ The denial of a motion for a continuance does not constitute a deprivation of due process, even if such denial is erroneous. As the supreme court pointed out in *Benton v. Marr* (1936), 364 Ill. 628, 5 N.E.2d 466:

> "If errors are committed or erroneous and unjust decisions are rendered they may be corrected in the manner provided by law for the correction of such errors, but mere error in a judgment or decree does not deprive the losing party of the benefit of due process of law.
>
> The sole question relating to the denial of the motion for a continuance is whether or not the trial court erred in its exercise of judicial discretion. Due process is in nowise involved." (364 Ill. 628, 629-30, 5 N.E.2d 466, 467.)

See also *Moore v. McDaniel* (1977), 48 Ill. App. 3d 152, 362 N.E.2d 382; *Acme Secret Service, Ltd. v. Alexander* (1968), 100 Ill. App. 2d 360, 241 N.E.2d 636 (abstract).

The record indicates that the court denied the motion for the continuance because of its reasonable impression that respondent was attempting to utilize dilatory tactics in order to postpone the proceedings. After the parties entered into the written stipulation to seek the professional psychiatric services and opinions of Dr. Melvin Seglin, as to whether the marriage was viable, that stipulation was proved up on the record. Respondent testified that he agreed to be bound by the stipulation and that if Dr. Seglin found that the marriage was not salvageable, he would give petitioner an uncontested divorce on the grounds of constructive desertion. Further, he would give up custody of the parties' two minor children. After Dr. Seglin rendered his opinion that the marriage was unsalvageable and any attempt at reconciliation would be fruitless,

respondent reneged on his stipulated agreement and raised public policy and constitutional arguments to block the prove-up of the stipulation. This caused the court to enter an order vacating and rescinding the stipulation. The trial then was not resumed until January 21, 1981. When the court, on January 23, 1981, rendered its decision on grounds, it set a trial date on custody and financial issues for February 24, 1981, at 2 p.m. Respondent thus had one month's advance notice of the trial on custody and financial issues. One week prior to the scheduled trial date, respondent filed a motion for substitution of attorneys, and then respondent's new attorney made oral motions for continuances on the basis of the change in counsel. The court properly denied these motions because substitution of attorneys on the commencement of trial is not good cause for granting of a continuance. (*Roberts v. McDaniel* (1959), 22 Ill. App. 2d 485, 161 N.E.2d 47; *Leathers v. Leathers* (1958), 13 Ill. 2d 348, 148 N.E.2d 773.) Furthermore, the actions of respondent suggested an effort to impede trial. On February 24, respondent's counsel appeared in court without his client and announced that he had just received a telephone call from his client informing him that respondent was receiving emergency medical treatment in the emergency room of a hospital and would be unable to proceed with trial. The court indicated that, if it were later established that respondent had, in fact, been medically unable to attend the hearing, the court would vacate the evidentiary hearing and grant respondent a trial *de novo* on the issue of custody. The court told counsel:

"Now, I have a suspicion he may not be ill. And he may be doing this simply to obtain a postponement. If that is so, why what he is doing is improper, and the hearings that we have this afternoon will stand. And we will go on tomorrow etc. I would expect that by tomorrow you are going to have a doctor in here testifying as to what the facts are with respect to his physical condition, if they are as he has represented them to you. I have strong suspicions that they may not be so."

Dr. Ilse Judas, the court-appointed psychiatrist, was the only witness who testified on February 24, 1981. Dr. Judas had prepared a written report in June of 1979 incorporating her findings, observations, theories and recommendations. Dr. Judas' testimony at the February 24 hearing was founded on the written report. Moreover, in September of 1980, the discovery deposition of Dr. Judas was taken by respondent's former attorneys. Thus, respondent's attorney had both Dr. Judas' written report and the transcript of Dr. Judas' discovery deposition available long before trial. Respondent, therefore, cannot claim that his attorney was taken by surprise at trial or that his own physical presence at the hearing would have made a difference to his attorney's ability to cross-examine Dr.

Judas. Accordingly, we find no prejudice resulting from respondent's absence during the hearing on February 24.

On February 25, respondent presented himself in court. He testified as to his absence from court on the 24th and on cross-examination testified that he drove himself to work at approximately 8:30 a.m. and then drove himself to the hospital at approximately 11:30 a.m. Despite the court's specific instruction to counsel for respondent, no medical expert witness was called to explain the alleged medical reason behind respondent's absence. Respondent did offer a copy of a report from Billings Hospital as an exhibit. He identified the signature appearing on the exhibit as his signature, but the court ruled that the exhibit was not admissible under the best evidence rule, as it was secondary evidence, a copy, not the original. Further, the custodian of the business record was not produced and therefore the copy could not be identified as a true and accurate copy of the business record under his custody and control. In view of respondent's failure to produce competent medical testimony or other evidence showing a legitimate medical reason for his absence on February 24, and considering his testimony that he drove himself both to work and to the hospital on that date, we conclude that the court properly refused to vacate the evidentiary hearing. It appears that the court did not err in finding that this was a tactic deliberately employed by respondent in bad faith in order to impede the trial. Moreover, even if the court had erred in proceeding with the trial in respondent's absence, it was harmless error because the court in announcing its decision to award petitioner custody of the minor children stated that Dr. Judas' testimony was not a controlling factor in arriving at the same. Thus, the decision would have been the same without Dr. Judas' testimony.

■■ In any case, respondent's absence from court that one day cannot be characterized as a due process violation. Respondent cites *Kopplin v. Kopplin* (1946), 330 Ill. App. 211, 71 N.E.2d 180, as support for his position. *Kopplin*, however, is distinguishable on its facts; there defendant's rights were violated because he was actually expelled from the courtroom after one outburst, and the facts indicate that defendant was subsequently prejudiced by his counsel's failure to cross-examine three important plaintiff's witnesses. In the present case, respondent chose to be absent from the February 24 proceedings. The court was in no way responsible for his absence. In addition, respondent had an opportunity to prove his medical disability and thus obtain a vacatur of that part of the trial that proceeded in his absence; he failed to do so. Accordingly, we find no abuse of discretion in the court's refusal to grant a continuance. See *Acme Secret Service, Ltd. v. Alexander* (1968), 100 Ill. App. 360 (abstract); *Moore v. McDaniel* (1977), 48 Ill. App. 3d 152, 362 N.E.2d 382.

### III

Respondent next contends that the court abused its discretion in awarding custody of the minor children to the petitioner. Again, we cannot agree. Section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Sat. 1977, ch. 40, par. 602) contains the relevant considerations for a determination of child custody.

"(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community; and

(5) the mental and physical health of all individuals involved.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child."

The record amply reveals that the court thoroughly considered all of the above factors in determining custody. The testimony of Dr. Judas emphasized the extremely close relationship between mother and children. She recommended that permanent care, custody and control of the two minor children be awarded to petitioner. She believed that given the present developmental level of each child, petitioner would better help them in terms of further progress and development. Further, she stated that she viewed the entire family interact together, she noted that respondent appeared "clinging" and needy of the children. She emphasized that a child ought not live with his or her parents because the parent is needy of the child. She interpreted respondent's behavior as a self-centered concern to keep his wife rather than a concern for the welfare of the children.

Sharon Zingery, caseworker from the Cook County Department of Supportive Services, conducted a social service investigation of the parties' household and also recommended that permanent custody of the parties' two minor children be awarded to petitioner. She testified that her impression of respondent was that his primary concern was preserving the marriage. Instead of discussing the needs of the children, respondent seemed more interested in discussing his relationship with his wife. In contrast, Sharon Zingery stated that her impression of petitioner was that she had oriented her life more toward planning for the needs of

the children, and that she had been actively involved and interested in her children's progress in school.

■■ Petitioner testified that she had virtually sole responsibility for performing household chores and raising the children, without assistance from respondent. She stated that respondent was largely an absentee father and that during 1978 he always arrived home in the evening after the children had gone to bed. The only day he spent with the family was Sunday and despite his wife's requests, he refused to participate in family activities and holiday celebrations. Thus, the testimony revealed that petitioner had more contact with the children and could provide a more secure and stable home. The trial court's custody decision, therefore, was proper. (See *In re Marriage of Kennedy* (1981), 94 Ill. App. 3d 537, 418 N.E.2d 947.) In *Kennedy*, the court held (94 Ill. App. 3d 537, 545):

> "The custodial decision rests on temperaments, personalities and capabilities, and the trial judge is in the best position to evaluate these factors. (*Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 407, 320 N.E.2d 581, 585.) Only where the award is contrary to the manifest weight of the evidence will it be reversed. *Soldner v. Soldner* (1979), 69 Ill. App. 3d 97, 103, 386 N.E.2d 1153, 1158."

Furthermore, this court in *In re Marriage of Ramer* (1980), 84 Ill. App. 3d 213, 217-18, 405 N.E.2d 401, opined:

> "Custody matters are within the sound discretion of the trial court, because it is in the best position to hear and evaluate the evidence. A judge has not abused his discretion unless his judgment is 'palpably erroneous, contrary to the manifest weight of the evidence or manifestly unjust.' (*In re Marriage of Poston* (1979), 77 Ill. App. 3d 689, 396 N.E.2d 576, 579.)"

Here there was no abuse of discretion.

## IV

Finally, respondent claims that the court committed error in ordering him to pay petitioner's attorney fees of $12,000. He asserts the fee award was improperly entered because the court failed to consider his financial inability to pay the award and petitioner's ability to do so. Also, respondent argues that the fees are excessive.

In March 1981, petitioner's attorneys filed a petition for the entry of an order for attorney fees and costs. The petition alleged that 163½ hours were expended in providing petitioner with legal services from January 1979 to March 1981. The petition further alleged respondent's ability to pay attorney fees and court costs and petitioner's inability to pay based on her lack of "sufficient financial resources. * * *"

Respondent filed a response to the petition, denying that petitioner was unable to pay and requesting that she be ordered to pay "all or

substantially most of her attorney fees over a period of years" because the dissolution of marriage had been for her benefit and that her assets had greatly increased as a result of real estate ordered conveyed to her.

On April 29, an evidentiary hearing commenced. Petitioner offered the testimony of an expert witness, Joseph Du Canto, to substantiate her position on the value of legal fees rendered to her by her attorneys, Kalcheim & Kalcheim, Ltd.

Joseph Du Canto is recognized as an authority, both academically and practically, in the matrimonial field. He testified that Michael Kalcheim, attorney for petitioner, is a specialist in matrimonial litigation and has a reputation in the community as being an excellent attorney. He further testified that presentation of contested cases on the grounds of mental cruelty require a high degree of skill on the part of the lawyer and extensive client preparations. Further, he stated in response to a hypothetical question asked by the court that where a case involved a stipulation where the parties agreed to go to a psychiatrist for help in connection with a possible reconciliation, and if the psychiatrist recommended that the marriage was no longer viable and could not be salvaged, the divorce would proceed as a noncontested case, and the psychiatrist, after many conferences, made such a determination, and one of the parties withdrew from that stipulation, the presentation of such a case as a contested case would be a "complicated matter."[1] In addition, he testified that in his opinion, the usual and customary hourly charge for the time and services rendered in such cases was between $100 and $125 per hour.

Following the evidentiary hearing, the court ordered respondent to pay $12,000 in attorney fees with $6,000 to be paid within 30 days and the remaining $6,000 to be paid at the rate of $1,000 per month for six months. If an installment is not paid by the 15th of the month, the entire sum becomes due.

The allowance of attorney fees is within the sound discretion of the trial court and such an award will not be reversed unless the trial court has clearly abused its discretion. (*Canady v. Canady* (1964), 30 Ill. 2d 440, 197 N.E.2d 42; *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 373 N.E.2d 576.) To justify an allowance of attorney fees, the party seeking this relief must show financial inability to pay; financial needs within the context of the couple's prior standard of living; and the ability of the other spouse to pay the attorney fees. *Gasperini v. Gasperini; Kenly v. Kenly* (1977), 47 Ill. App. 3d 694, 365 N.E.2d 379.

■■ Respondent does not claim that he is unable to pay. Instead he argues

---

[1] The court had allowed the stipulation to be withdrawn on condition that $2,812.50 in legal fees in connection therewith be paid. This amount was paid and the stipulation withdrawn. These hours were not included in the final petition for fees.

that because petitioner benefitted directly from the legal services of her attorneys it would be "grossly unfair" for him to pay all of petitioner's legal fees. We find this argument unconvincing.

It is not necessary for a party to be destitute in order for a trial court to award attorney fees. (*Gilmore v. Gilmore* (1979), 74 Ill. App. 3d 831, 393 N.E.2d 33.) Rather, as the *Gasperini* court observed:

> "It is sufficient to support an award of fees that disbursement of the wife's funds would exhaust her own estate, or strip her of her means of support and undermine her economic stability." 57 Ill. App. 3d 578, 582.

Based upon these principles, courts have sustained a trial court's award of fees where the party seeking the award had a regular income or salary (*Gilmore v. Gilmore*; *Gasperini v. Gasperini*); a savings account (*Kaufman v. Kaufman* (1974), 22 Ill. App. 3d 1045, 318 N.E.2d 282); stocks, securities or other liquid assets (*Kenly v. Kenly* (1977), 47 Ill. App. 3d 694, 365 N.E.2d 379); substantial securities and other assets (*Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 400 N.E.2d 56); or real estate (*Gasperini v. Gasperini*).

■■ In the present case, the record reflects evidence of the parties' respective incomes. Specifically, petitioner had a gross income of approximately $8,863 as compared to respondent's gross income of approximately $29,000—"plus" gross income. Thus, her income was not even one-third of his. Additionally, she had been out of the job market during the entire 8-year duration of the marriage and is the custodian of two minor children. In contrast, respondent is a licensed clinical psychologist who has begun a private practice and recently purchased a 1981 Cadillac Seville sedan for a price of $16,000. Furthermore, petitioner had no assets other than the marital home, granted her by the court, which has a fair market value of $47,000, subject to a lien of $5,000 payable to respondent. In addition, there is an outstanding mortgage of about $20,000 on the property, payable by petitioner. Consequently, the court properly found that respondent had a financial ability superior to that of petitioner, and the determination that petitioner could not pay her attorney fees was not an abuse of discretion.

Respondent finally asserts that the fees awarded to petitioner's attorneys were excessive. We take notice that there have been numerous recent Illinois decisions considering the question of attorney fees in matrimonial cases. This court in *In re Marriage of Janetzke* (1981), 97 Ill. App. 3d 418, 422 N.E.2d 914, analyzed the cases and pointed out the applicable standards relating to the awarding of attorney fees. The court stated the factors to be considered as follows:

> "[T]he nature of the controversy; the questions at issue; the significance or importance of the subject matter; the degree of the

responsibility involved; the standing or skill of the person employed; the time and labor involved; and the relative financial positions of the parties. (*In re Marriage of Scott* (1980), 85 Ill. App. 3d 773, 407 N.E.2d 1045; *Canham v. Saisi* (1978), 65 Ill. App. 3d 686, 382 N.E.2d 654; *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 373 N.E.2d 576; *Green v. Green* (1976), 41 Ill. App. 3d 154, 354 N.E.2d 661; *Greenbaum v. Greenbaum* (1973), 14 Ill. App. 3d 217, 302 N.E.2d 165.) In addition, it has been held that the time charged must have been necessary for the proper handling of the matters involved. (*Gasperini v. Gasperini*; *Moreau v. Moreau* (1973), 9 Ill. App. 3d 1008, 293 N.E.2d 680); that the fees must be fair and just to all parties involved (*Canham v. Saisi*; *Green v. Green*); that the time expended and the work done must be itemized (see *In re Marriage of Raidbard* (1980), 87 Ill. App. 3d 158, 408 N.E.2d 1021; *In re Sharp* (1978), 65 Ill. App. 3d 945, 382 N.E.2d 1279); and that as stated in *In re Marriage of Jacobson* (1980), 89 Ill. App. 3d 273, 277, 411 N.E.2d 947, 950:

> '[I]t is not sufficient to merely multiply the number of hours expended by counsel, even as shown by detailed records, by whatever hourly rate is determined to be reasonable without consideration of the other factors * * *.' " 97 Ill. App. 3d 418, 423-24, 422 N.E.2d 914, 919.

Moreover, it has been held that generally fees are granted in divorce cases upon the basis of a separate hourly rate for court time and office time (*e.g., Christian v. Christian* (1979), 69 Ill. App. 3d 450, 387 N.E.2d 1254); and that the court time rate is higher in recognition of the greater skill required, but courts will not hesitate, however, to reduce the total number of court time hours billed if, in fact, such skill was not reflected. *Gasperini v. Gasperini.*

Application of the foregoing principles indicates that the award of fees in this case must be reduced. Although we find that the grounds issue was seriously contested through the trial, and that skilled counsel for both parties have been engaged in persistent and contentious litigation, we do not believe that the record demonstrates such complexity of issues as would justify an award of $12,000. Also, even though the issue of custody was contested, that did not make the case unusually difficult. See *In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 420 N.E.2d 555; *In re Marriage of Kruse* (1980), 92 Ill. App. 3d 335, 416 N.E.2d 40.

While petitioner's attorneys claim 163½ hours were spent representing petitioner both in and out of court, something more must be shown to justify an award of fees than merely a compilation of an hourly rate. *In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 651, 420 N.E.2d 555, 566.

In perusing petitioner's time records, we find that approximately 79

hours charged represents telephone conferences and other conferences with petitioner and witnesses. This represents almost one-half the total time spent by petitioner's attorneys on this case. Further, petitioner's attorney stated that even if a phone call lasted less than a quarter hour he would bill for a quarter of an hour. This practice necessarily would result in an inflated billing figure for telephone conferences. As to the conferences with petitioner and other persons, there was little explanation as to the particular business covered in each of these conferences and why this amount of time was necessary. (*Gasperini v. Gasperini.*) We do not think that in all fairness respondent should be charged with a greater amount of time than was necessary for these conferences.

Moreover, considering the total hours allowable in this case, we note that although petitioner's attorneys, in their petition, differentiated between office time and court time, the ultimate aggregation of total hours spent on the case in calculating the fee ignores this distinction. Since court time is billed at a higher rate, the fact that no distinction is made results in charging the same rate for office work as is charged for court work, an improper result. See *Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 400 N.E.2d 56.

■■ The trial court's award of $12,000 presumably compensated petitioner's attorney, Michael Kalcheim, at a rate of approximately $82 per hour for 142½ hours, which was the amount of time rendered strictly by him.[2] In recent cases in which attorney fees were incurred, this court has sanctioned significantly lower hourly rates than was here awarded to petitioner. (*Christian v. Christian* ($75 court time, $35 office time); *Tippet v. Tippet* (1978), 65 Ill. App. 3d 1018, 383 N.E.2d 13 (overall hourly rate of $50 reversed); *Davis v. Davis* (1978), 63 Ill. App. 3d 465, 380 N.E.2d 415 ($40 allowed); *Gasperini v. Gasperini* ($40 allowed); *Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 400 N.E.2d 56 (hourly rate of approximately $74 per hour).) In light thereof and considering the requirements placed upon the trial court by the cases cited above in determining attorney fees, we find that the record does not support the award of attorney fees here. Consequently, we reduce the aggregate attorney fees to $9,000 and find this amount to be fair and reasonable for the service rendered to petitioner. Respondent shall pay $6,000 within 30 days and the balance of $3,000 to be paid at the rate of $1,000 per month for the following three months. The entire amount is to be paid within four months. In making this determination, we do not disturb the court's other

---

[2] The total number of hours reflected on the attorney fee affidavit was 163½ hours. Mr. Kalcheim's associate rendered services of time amounting to 20 3/4 hours. Mr. Kalcheim indicated he was not charging for his associate's services because she had only been in a minor role in the case.

conditions pertaining to installment payments of the sum due and the interest allowable.

In summary, the order granting petitioner dissolution of the marriage on the grounds of extreme and repeated mental cruelty, physical cruelty and constructive desertion is affirmed; the order granting permanent custody of the minor children to petitioner is affirmed; the order awarding a fee of $12,000 to petitioner's attorneys is reduced to the amount of $9,000.

Judgment affirmed as modified.

LORENZ and MEJDA, JJ., concur.