Robert E. CUMBERLAND, Sr.

v.

ISTHMIAN LINES, INC.

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 9, 1967.

———◆———

August J. Bubert, Bubert & Slavich, New Orleans, La., for plaintiff.

John Poitevent, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

## FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW
## FACTS

COMISKEY, District Judge.

1. Robert E. Cumberland, Sr., was employed by Isthmian Lines, Inc., as an ablebodied seaman aboard its S.S. STEEL VOYAGER from October 2, 1961 until January 30, 1962. He brought suit for damages alleging negligence under the Jones Act and unseaworthiness under the General Maritime Law against his employer. In the original complaint it is asserted that Mr. Cumberland sustained personal injuries aboard the S.S. STEEL VOYAGER on February 8, 1961. At the trial of this case counsel for Mr. Cumberland was allowed to amend his original complaint and to specify that the accident occurred sometime between November 22 and November 24, 1961.

2. Mr. Cumberland testified that on November 22, 1961 at a safety meeting conducted aboard the STEEL VOYAGER, while the ship was bound from the Port of San Francisco to the Port of Manila, Philippine Islands, he brought to the attention of the officers of the vessel that a certain catwalk or steps constructed to allow the crew to pass over deck cargo on the forward deck of the STEEL VOYAGER was "rickety".

Isthmian Exhibit 3A, which is a copy of the safety meeting in question, reflects that there were no accidents aboard the ship during the period from October 25, 1961 through the date of this particular meeting held on November 22, 1961. The exhibit also reflects that Mr. Cumberland reported that the catwalks should be placed on the inside of deck cargo instead of on top and complained that they were not secure enough and better materials should be used in their construction.

3. Mr. Cumberland testified that sometime after the meeting of November 22, and before the vessel arrived in Manila on November 24, he was ascending the wooden steps of the catwalk with one hand on a railing provided as a handrail at approximately 0100 hours, when he fell on the steps of the catwalk, striking his right groin area against a part of the steps. Mr. Cumberland stated that he had severe pain and that he reported this accident to his watch partner, but did not immediately report the accident to any officer of the vessel. He testified that the following day he did report his accident to the Chief Mate.

4. Under cross-examination Mr. Cumberland admitted that there was no foreign slippery substance on the steps of the catwalk; that none of the steps of the catwalk broke; that the handrail he was holding as he ascended the catwalk did not break; that the seas were moderate; that there was adequate light for him to see what he was doing as he ascended the steps of the catwalk; that the steps were like ordinary stair steps, though made of rough lumber; and that the steps were constructed of boards two inches by twelve inches, with some being three inches by twelve inches in size.

5. Mr. Cumberland admitted that he continued to stand his watches following his alleged fall, as evidenced by Isthmian Exhibit 1, which is the deck log of the STEEL VOYAGER. The log shows the name of Mr. Cumberland and others who stood duties as lookout aboard that vessel during the voyage in question. Mr. Cumberland stated that the pain in his

groin subsided and that he continued to work. He did not ask to see a doctor in Manila concerning the alleged injury to his groin, though he reported other medical complaints from time to time aboard the vessel. It was not until January 16, 1962, while Mr. Cumberland was standing watch or preparing to stand watch as lookout, at 0140 hours, that he felt severe stomach cramps or pain in his abdomen, resulting in his being incapacitated and put to bed aboard the STEEL VOYAGER. From January 16, 1962, Mr. Cumberland did not carry out any further duties aboard the vessel, but remained in his quarters receiving medical care from time to time. He was seen by a doctor at Gibraltar, and again at Halifax, Nova Scotia. After signing off the vessel in New York, on January 30, 1962, Mr. Cumberland was given a Master's certificate to go to a Marine hospital. He then flew to New Orleans, Louisiana, and was admitted ino the United States Public Health Service Hospital at New Orleans on February 1, 1962. See page 6 of Exhibit identified as "Marine Hospital Records", jointly offered by both complainant and defendant. Upon admission to the Marine Hospital, Mr. Cumberland's condition was diagnosed: Laennec's cirrhosis; right inguinal hernia; chronic duodenal ulcer; asthma, bronchial mild.

6. The first medical history given by Mr. Cumberland at the Marine Hospital reflects that he had a pain in his right upper quadrant of one month's duration. There is no mention made of any fall in November of 1961 or at any time. This, of course, would indicate that Mr. Cumberland's first pain connected with any hernia was experienced on or about January 2, 1962, and not sometime between November 22 and November 24, 1961 as he now alleges. See page 59 of Exhibit identified as "Marine Hospital Records". After having undergone a hernioplasty operation at the Marine Hospital and receiving medical care, Mr. Cumberland was declared fit for duty on April 3, 1962. It was stipulated by counsel representing complainant and defendant that Mr. Cumberland was properly paid maintenance during the period of his convalescence by his employer, Isthmian Lines, Inc.

7. Mr. Cumberland's medical records reflect that following his treatment for a direct right inguinal hernia during the period of February 2, 1962 through April 3, 1962, he then experienced recurrent right inguinal hernias. The first during the period of April 1, 1963 through September 19, 1963, when a second hernioplasty operation was performed. Again during the period of February, 1964 through June, 1964, Mr. Cumberland had a recurrent right inguinal hernia and underwent a herniorrhaphy. Mr. Cumberland alleges that these subsequent hernia operations were all related to his first operation and that defendant must respond in damages since all of these operations are causally connected with his fall aboard the "rickety" catwalk steps of the STEEL VOYAGER sometime during the period between November 22 and November 24, 1961.

8. The testimony of Mr. O. N. Davidsen, Chief Mate of the STEEL VOYAGER, was taken by deposition, this trial having been continued several times before the actual trial date by order of Court. Mr. Davidsen verified that the log book of the STEEL VOYAGER reflected that Mr. Cumberland had served as lookout during his assigned watch from 12:00 to 6:00 on each of the days that the vessel was proceeding from San Francisco to Manila and that he subsequently continued to serve as lookout until he was incapacitated in January of 1962. See page 10 of Davidsen deposition and Isthmian Exhibit 1.

9. Mr. Davidsen testified concerning the entries in the medical log of the STEEL VOYAGER for the voyage in question. He pointed out that Mr. Cumberland had brought minor ailments and conditions to his attention and that on each occasion he had correctly logged these complaints. See Isthmian Exhibit 2, Entries of November 28, 1961 and December 1, 1961, appearing on page 1 of the medical log. Entries of January 16

and January 17, 1962, appearing on page 3 of the medical log. Entries of January 18 and January 27, 1962, appearing on page 4 of the medical log, and the entry of January 30, 1962, appearing on page 5 of the medical log. See deposition of Mr. Davidsen, pages 11 through 15.

10. Mr. Davidsen testified concerning the safety meetings held aboard the STEEL VOYAGER during this particular voyage. He identified Isthmian Exhibit 3A, being the report of a safety meeting conducted on November 22, 1961, and also Isthmian Exhibit 3B, the report of a safety meeting held on January 12, 1962. Isthmian Exhibit 3B contains a listing and description of accidents occurring during the period from November 22 through January 12, 1962. There is no mention made of any injury to Mr. Cumberland in these entries.

11. Mr. Davidsen, the Chief Mate of the STEEL VOYAGER, testified that he had no trouble using the steps or the catwalk. He testified that there was no injury ever reported to him concerning the steps or the catwalks. See deposition, page 20, of Mr. Davidsen's testimony. Mr. Davidsen, upon cross-examination, testified that there was nothing wrong with the catwalk aboard the vessel to his recollection. See page 27 of his testimony.

12. Dr. William Leon testified as a medical expert for complainant. He stated that he was told by complainant's attorney that the accident had occurred on November 14, 1961, as shown in his report, identified as Isthmian Exhibit 6. It was his opinion that, based upon the description of the accident given to him by Mr. Cumberland, that Mr. Cumberland could have had a right inguinal hernia that was traumatic in origin. He admitted, however, that there were many complicating factors, such as obesity, a severe liver ailment and asthmatic bronchitis, which might bear some relationship to the first hernia and could easily lead to a recurrence of this type of hernia. It was his opinion that Mr. Cumberland would continue to have difficulties with hernia until he lost weight and underwent treatment for his bronchial condition. Upon being shown a copy of a medical report by Dr. Marshall L. Michel, wherein Dr. Michel stated that in his opinion the recurrent right direct inguinal hernia cannot definitely be said to be related to the injury aboard the STEEL VOYAGER, Dr. Leon disagreed with Dr. Michel's conclusion. The testimony reflects that Dr. Michel first examined Mr. Cumberland at the request of Mr. Cumberland's attorney.

13. Dr. James H. Stewart testified as a medical expert for Isthmian Lines, Inc. His report of initial examination, dated January 8, 1965, was identified as Isthmian Exhibit 7. Dr. Stewart was of the opinion, as of January 8, 1965, that Mr. Cumberland had an intact repair of the right inguinal area and no evidence of any recurrent hernia. Dr. Stewart pointed out, however, that there were at least two conditions which would cause an increased incidence of inguinal hernia. One of these factors was obesity, particularly obesity of the abdomen, and the other was the presence of chronic pulmonary pathology. Dr. Stewart, in answer to a hypothetical question, "Assuming a 44-year old male with Laennec's cirrhosis of the liver, asthmatic condition and obesity, being a person of 5 feet, 9 inches in height and weighing approximately 210 pounds, would you consider such a person predisposed to have a direct inguinal hernia?" stated yes and explained the reasons why the fascia would have a tendency to rupture from within with such pre-existing conditions of the body. He testified that if such a hypothetical person were to receive an external blow to his abdomen on or about November of 1961, sufficient to cause a direct inguinal hernia, that the symptoms of such a hernia would be immediate extreme pain and shock so that the patient would, in fact, be disabled right away. He testified that assuming such a person did not receive a blow to his abdomen, but continued to do the work of a seaman, standing watches, from the period of November, 1961 until January 16, 1962, or some two months later, and then such

a person experienced severe stomach cramps without having received any external blow, he would consider such a hernia that may have manifested itself on January 16, 1962 as being ordinary in the sense that it would not have been caused by an exterior blow to the abdomen. Dr. Stewart testified that there are many traumas that can result in an ordinary hernia, as opposed to a hernia being experienced by an exterior blow to the abdomen. He explained that natural degeneration and age was a factor; that an asthmatic condition with coughing and sneezing would be a factor; that obesity was a factor; and that the consumption of alcohol sufficient to result in Laennec's cirrhosis of the liver would also be a factor. These conditions result in a natural weakening of the fascia so that direct inguinal hernia appears without any exterior blow.

### LAW

■ 1. Under the Jones Act, 46 U.S.C. Section 688, the employer of a seaman must respond in damages if his negligence plays any part, even the slightest, in producing an injury for which damages are sought. See Rogers v. Missouri Pac. R.R., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957); Ferguson v. Moore-McCormick Lines, Inc., 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957); and Hampton v. Magnolia Towing Co., 338 F.2d 303, (5th Cir. 1954). A reasonably safe place in which to work is an obligation owed by the employer of a seaman to his employee, and failure to provide such a reasonably safe place in which to work can give rise to a cause of action for negligence. See Vickers v. Tumey, 290 F.2d 426, (5th Cir. 1961). Negligence may also result from actual or constructive notice of an unsafe place for members of the crew to work, and it may arise when proper equipment is not furnished after notice is received. See Sandford v. Caswell, 200 F.2d 830, (5th Cir. 1953).

■ The only adverse testimony in this case concerning the steps of the catwalk were that they were "rickety". At no time did Mr. Cumberland explain whether the "rickety" condition allowed the boards to bend, shake or sway. He did admit that none of the boards broke; that a handrail was available; and that the handrail did not break. Mr. Cumberland testified that he did not slip on any foreign slippery substance and that there was adequate lighting for him to see what he was doing. There is no evidence in this case of any negligence, even the slightest, on the part of Isthmian Lines, Inc.

■ 2. The shipowner's duty to provide a seaworthy vessel to a member of the crew is absolute, continuing and non-delegable. See Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). The shipowner's duty to furnish a seaworthy vessel does not, however, require him to provide an "accident-free" ship. He is under a duty "only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service". See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549–550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960); and Mills v. Mitsubishi Shipping Co., 358 F.2d 609 (5th Cir. 1966).

■ In applying the doctrine of seaworthiness to the facts of the instant case, the court finds that the steps forming part of the catwalk in question were "reasonably fit". The chief officer of the vessel testified that he had used the same steps on the voyage from San Francisco to Manila and had no difficulty in ascending or descending the steps. The fact that the steps, being part of the catwalk, were not made of finished lumber and were not built to the complete satisfaction of Mr. Cumberland does not mean that they were not reasonably fit for the purposes for which they were intended. There is no evidence that anything connected with the catwalk or steps broke, or that there was anything that caused Mr. Cumberland to fall, except that he

lost his own balance while walking up the steps. That the steps were "reasonably fit" is further evidenced by the fact that they were used constantly by other members of the deck department going from the main cabin of the vessel forward to the bow without any reports of alleged accidents or mishaps.

In the case of Collon v. Trinidad Corp., 188 F.Supp. 97 (S.D.N.Y.1960), involving the personal injury of a seaman, who allegedly slipped on his vessel's alleyway, the Court, after finding no persuasive evidence from which it could reasonably infer that defendant was negligent or that the vessel was unseaworthy when the plaintiff claimed he slipped, correctly observed,

> "It seems only fair that men who make their livelihood on the water can be expected to cope with some of the hazardous conditions that must prevail even on a seaworthy vessel. Any stricter rule would require the intervention of traveling companions to guide and protect sailors in going about the vessel to perform their duties. * * *"

3. For a seaman to recover damages against his employer for negligence under the Jones Act and/or unseaworthiness under the General Maritime Law, he must prove not only that he suffered an injury but that the negligent act or omission and/or the unseaworthy condition was the proximate cause of his injury or illness. See Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455 (1944), and Pittsburgh S. S. Co. v. Palo, 64 F.2d 198 (6th Cir. 1933); Norris, The Law of Seamen, 2nd Edition, Volume 2, Sections 621 and 689. The Court finds that Mr. Cumberland has failed to prove by any evidence that his direct inguinal hernia, which was first diagnosed at the U.S.P.H.S. Hospital in New Orleans, Louisiana on February 2, 1962, was proximately caused by an alleged fall sometime between November 22 and November 24, 1961.

4. Under the General Maritime Law in a claim for unseaworthiness, and under the Jones Act for negligence, the doctrine of proportionate fault, sometimes referred to as comparative negligence, is recognized. See American Stevedores, Inc. v. Porello, 330 U.S. 446, 458, 67 S.Ct. 847, 91 L.Ed. 1011 (1947) and Section 3 of the Federal Employers' Liability Act, 45 U.S.C. Section 53. Based upon the findings made herein, complainant did not sustain a fall or an injury between November 22 and November 24, 1961. If there had been a fall and injury complainant's own negligence would be the 100% cause of the fall upon the steps comprising a portion of this catwalk. Complainant knew that the steps were, as he described them, "rickety". Even though the catwalk did not break and he did not slip on any foreign slippery substance, the complainant managed in some fashion to lose his balance. The only explanation under these facts for complainant losing his balance when a handrail was available is his own gross carelessness.

In Teal v. Greenville Mid-Stream Service, Inc., 321 F.2d 903, (5th Cir. 1963), the 5th Circuit found the trial court's decision that where a seaman slipped on a deck he was cleaning with soap, his own negligence contributing 100% to the accident, would bar any recovery, even though the deck was momentarily unseaworthy.

## CONCLUSION

This Court finds that Isthmian Lines, Inc. was not negligent and that the S.S. STEEL VOYAGER, including the catwalk and steps over deck cargo, was seaworthy. The sole cause of complainant's alleged fall was his own 100% negligence. Complainant has failed to prove that his subsequent direct inguinal hernia was proximately caused by any negligent act or omission on the part of Isthmian Lines, Inc., or any unseaworthiness as pertains to the S.S. STEEL VOYAGER.

Judgment will therefore be that complainant's demand for damages under the Jones Act, Title 46 U.S.C. Section 688, will be denied, and that complain-

ant's demand for damages under the General Maritime Law for alleged unseaworthiness of the S.S. STEEL VOYAGER will also be denied.

Judgment to be prepared and submitted by the Clerk of Court.