William **BILGER**, Plaintiff,

v.

**MARITIME OVERSEAS CORPORA-TION, a corporation, Defendant.**

**No. 47450.**

United States District Court
N. D. California.

Feb. 4, 1969.

Jarvis, Miller & Stender, Hugh B. Miller, San Francisco, Cal., for plaintiff.

Lillick, McHose, Wheat, Adams & Charles, Warren W. Wilson, San Francisco, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TUTTLE, District Judge.

This is a seaman's action for damages for personal injury. Jurisdiction is in admiralty and recovery is claimed under the Jones Act and under provisions of general maritime law.

The following facts numbered 1 are either agreed upon between the parties or are not in dispute. Other facts will be found by the Court based upon its resolution of conflicting or disputed testimony. Such findings will be numbered 2 et seq.

### FINDINGS OF FACT

1. The plaintiff was employed by defendant's vessel S. S. OVERSEAS DIN-NY as chief electrician. At the time of the injury he had served at sea over a period of some twenty years during which time he spent, on the average, seven to eight months out of each year afloat. At approximately 6:30 A.M. on June 6, 1967, plaintiff suffered an injury to his right foot when he was struck by the launch, on which he had just returned from a shore trip, while ascending a ship's rope ladder (hereafter Jacob's ladder) to gain the deck of the vessel. Plaintiff was helped over the side by the ship's boatswain, received rudimentary first aid from the Third Mate and was seen by the First Mate, in the absence of the Master, when the First Mate came on duty an hour and a half later.

The injuries consisted of a fractured large toe of the right foot and a severely cut heel. Subsequent surgery required two skin grafts to the heel. The injury resulted in plaintiff's being marked unfit for duty for a period of six months and nine days. Unearned wages paid reduced the period during which the injury prevented plaintiff's shipping out to five months and three days.

The ship's log discloses that from at least June 1st through June 6th it was anchored at an assigned anchorage outside the breakwater in Manila Bay while awaiting orders to proceed to discharge cargo at Saigon. The weather during the entire period was unsettled. The log disclosed that variations in wind velocity ran from force 2 to force 5.

At 5 P.M., June 1st (1700 hours according to the log), the Master caused the following notice to be posted: "Crew taking shore launch in rough seas board and embark at own risk and pre-cautioned about danger. Advising them to wait until calmer seas." The wind force at 4 P.M. (1600 hours) is shown on the log at force 3-4, and at 8 P.M. (2000 hours) as force 5.

June 3, 1967, was Saturday and plaintiff was at liberty. He left on a liberty launch for shore leave at approximately

noon, at which time the wind velocity was shown on the log as force 2.

According to the Beaufort scale from which the Master and Mates designated the wind force, the following descriptions are given in relation to the different "forces" of wind utilized for log entries. Force 2 is described as "light breeze" with a velocity of 4 to 7 miles per hour and is characterized by "small wavelets still short but more pronounced; crests have a glassy appearance and do not break"; further characterized by "probable mean height of waves of 1 foot." The sea is described as "smooth." Force 3 is described as a "gentle breeze" having a velocity of 8 to 12 miles per hour; it is further characterized as a condition of "large wavelets"; crests begin to break; foam of glassy appearance. Perhaps scattered whitecaps and having a "probable mean height of waves of 2½ feet." Force 4 is described as a "moderate breeze" having a velocity of 13 to 18 miles per hour; it is characterized by "small waves, becoming longer; fairly frequent whitecaps" and having a "probable mean height of waves of 5 feet." Force 5 is described as "fresh breeze" with a velocity of 19 to 24 miles per hour and is characterized by "moderate waves taking a more pronounced long form. Many whitecaps are formed (chance of some spray)." The probable mean height of waves is 10 feet.

Plaintiff returned to the S. S. OVERSEAS DINNY on the liberty launch, a steel craft some 25 feet in length, which arrived alongside the DINNY at approximately 6:30 A.M. According to the ship's log, the wind at 4 A.M. was at force 3 and at 8 A.M. was entered as "3–4." The log showed that at 4 A.M. the weather was "overcast with small southwesterly sea and swell" and at 8 o'clock "cloudy moderate southwesterly sea and swell."

The ladder in use was on the lee side of the vessel, although, being at anchor, the DINNY did not make much of a lee.

The DINNY was equipped with a gangway, which is a rigid movable companionway or staircase that can be lowered from deck level to near the water when appropriate to permit debarking and embarking at sea. The companionway was not used to receive the four seamen, including plaintiff, upon their return to the vessel on June 6th. It was used to permit plaintiff to debark with his injured foot at approximately 5 P.M. the same afternoon. The ship's log showed the wind to be at force 3 at 4 o'clock and at force 2–3 at 8 o'clock.

The Jacob's ladder in use by the DINNY at the time of the injury is constructed of a pair of bars imbedded in oval wooden blocks approximately 12 to 14 inches apart. The blocks, which are strung together by ropes from top to bottom, are some 6 to 8 inches wide at the center portion and some 8 inches long, so that when resting against the side of the vessel the two bars are held away from the perpendicular side of the vessel by several inches, thus permitting a footing on the two parallel bars as one climbs upward.

The foregoing finding No. 1 includes facts that, as above stated, are either admitted or are without substantial dispute. The following facts, beginning with No. 2 are found by the court upon careful consideration of the testimony and other evidence in the record.

2. The use of a Jacob's ladder constructed as was the one in issue is normal for the boarding of experienced seamen from a small boat at sea.

3. The use of such a ladder is safer and is much more usual than a gangway when the seas are rough, but not too rough to permit debarking or embarking from a launch.

4. The mean height of the waves at the time of plaintiff's injury was approximately 5 to 6 feet.

5. The use of the Jacob's ladder as a means of embarking the plaintiff and the other seamen from the launch under the circumstances here present did not create a condition of unseaworthiness.

6. There is no evidence to warrant a finding that the management of the launch in permitting the plaintiff and the other seamen to step from the deck (some 8 feet wide, with a gunwale some 8 to 10 feet wide) while the lower extremity of the ladder was being held by a crewman on the launch created a condition of unseaworthiness of the vessel.

7. Immediately preceding plaintiff Bilger's attempt to climb the Jacob's ladder an older member of the crew (of age 60 or thereabouts) had stepped onto the ladder. His ascent was slow. I find that this retarded plaintiff's ascent of the ladder. I further find that normal and ordinary use of the ladder would require each seaman to await his turn until the next preceding person was far enough up the ladder to permit him to traverse enough of the steps to be clear of the launch if it was raised by the next succeeding wave. I therefore find that, if used in the ordinary and normal manner, the combination of the use of the launch and the Jacob's ladder did not create a condition of unseaworthiness.

8. I find that no condition of unseaworthiness existed by reason of the fact that the DINNY did not utilize a "ship's rope" since I find that, even if used, it in not evident that this injury could have been prevented.

9. I find that none of the acts or conditions heretofore described constituted negligence on the part of the vessel or its owners.

10. I find that the vessel was not negligent by reason of the Master's not forbidding the crew to take shore leave in the circumstances existing at noon on June 3, 1967, nor by the failure of the watch on the DINNY to deny the right to re-embark on the morning of June 6, 1967.

## CONCLUSIONS OF LAW

It is obvious that the transfer of a person from a bobbing launch at sea to a rope ladder hanging down the side of a rolling vessel is one that requires a considerable degree of physical coordination and agility. The same can be said of many functions required of seamen in the normal routine of operating a vessel. No witness testified to any facts which would permit a finding that the nature of the maneuver was such as would warrant the Master's interference with the leave privileges or a finding that the means effected were not reasonably designed, or that they were used in a manner that would create a condition of unseaworthiness.

I therefore conclude that the plaintiff has failed to establish either unseaworthiness of the vessel or negligence on the part of the defendant as a cause of the injury suffered by the plaintiff on June 6, 1967.

Accordingly, this Court directs that an appropriate judgment be entered in favor of the defendant, with its proper costs.