WILLIAM C. RUFFINER, Plaintiff-Appellee, v. MATERIAL SERVICE CORPORATION, Defendant-Appellant.

First District (5th Division)   No. 83—1859

Opinion filed June 7, 1985.—Rehearing denied July 25, 1985.

748

SULLIVAN, J., dissenting.

Lord, Bissell & Brook, of Chicago (Richard E. Mueller, Stephen A. Milwid, Hugh C. Griffin, and Joan M. Engelman, of counsel), for appellant.

John M. Janewicz, of Chicago, for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Defendant, Material Service Corporation, appeals from a judgment for plaintiff William Ruffiner in th is action under the Jones Act (see 46 U.S.C. sec. 688 (1976)) and general maritime law. The jury awarded plaintiff $1,250,000 as compensation for injuries sustained when he fell from a ladder aboard defendant's vessel, the Irving Crown. Defendant contends that the verdict was based on incompetent evidence, that the jury's award was excessive, and that the trial court submitted erroneous verdict forms to the jury. Facts relevant to our disposition follow.

On March 25, 1977, motor vessel Irving Crown towed a group of barges northward on the Illinois River near Joliet. The Irving Crown was built by the Sturgeon Bay Shipbuilding Company in 1952 and is owned by defendant Material Service Corporation. The vessel is

equipped with a retractable pilot house which, when lowered, allows the vessel to pass under obstructions such as bridges, and when raised, affords the captain or pilot a better view of the river. The pilot house is often accessed by dual port side ladders: one ladder is permanently affixed to a lower bulkhead and the other, adjacent to the left of the bulkhead ladder, is attached to the pilot house. The ladders slide alongside one another in order to accommodate the movement of the pilot house.

At approximately 9:15 that morning, plaintiff, chief engineer on the Irving Crown, left the engine room to go to the pilot house, which was at full height. Plaintiff climbed to the top of the bulkhead ladder, and was in the process of moving over to the bottom of the pilot house ladder, when he fell to the steel floor of the ladder well, some seven feet below. He testified that he had placed his left foot and left hand on the pilot house ladder and had just removed his right foot from the bulkhead ladder when he "slipped."

The captain and first mate were in the pilot house at the time. The captain saw plaintiff through the pilot house window, heard the fall, then saw plaintiff lying on the deck. He sent the first mate to see what happened. The first mate testified that he climbed down the dual ladders in about five seconds; the ladders were clean and had no grease or oil on them. Plaintiff was "dizzy" and "groggy," as the mate helped him to his quarters, where plaintiff rested until he could be taken to an ambulance. The captain and first mate stated that plaintiff had always been a good worker, and had never shown signs of neck, back or hip injury before the fall.

Plaintiff's expert, Edward McLean, testified that he was registered as an engineer, that he graduated from the Naval Academy in 1935, that he had studied at several postgraduate institutions, and that he belonged to a variety of professional societies. McLean stated that he had done research and development, including design work, for the Navy. He said that he ran a large naval contracting company from 1938 through World War II, and he had been a consultant since the war. He had participated in the design and construction of some 200 utility and industrial plants, all of which incorporated fixed ladders. He also said that he knew about the types of ladders used on seagoing vessels.

Plaintiff's expert testified that the American National Standards Institute prescribed standards for fixed ladders and that the standards would apply to ladders mounted on seagoing vessels. He stated that those standards require a rung width of at least 16 inches, and a space not less than 7 inches between the ladder and the surface to

which it is affixed. McLean had examined the Irving Crown and testified that the dual ladders varied from the standard. The bulkhead ladder's rungs were $9^{11}/_{16}$ inches wide, and the ladder was $6^{11}/_{16}$ inches from the bulkhead; the pilot house ladder's rungs were only $5^{11}/_{16}$ inches wide and the ladder was only $5^{3}/_{4}$ inches from the pilot house. He opined that, "the factors that I have recited would render the ladder as constructed unsafe for use." McLean explained that because the rungs were too narrow, it would be difficult to slide a shoe into place without interference from the vertical rails, and because the ladder was too close to the mounting surface, it would be difficult to place the ball of the foot squarely on the rung.

On cross-examination, plaintiff's expert admitted that he had not designed or constructed ladders for any seagoing vessels. Asked when the standards were promulgated, McLean stated that the earliest standards were issued by the National Safety Council in 1926, and that later, the American Standards Association adopted standards which were accepted in 1970 by the newly formed American National Standards Institute. He did not know what changes were made in the standards over time.

The remainder of plaintiff's case went to causation and damages. After the fall, plaintiff stayed for two days at St. Joseph's Hospital in Joliet, where initial X rays were taken. He rested at his home in Arkansas for a week, then returned to work aboard the Irving Crown. He said that he could not do his job because he was in severe pain, and after a few days, he asked defendant to refer him to a doctor. Defendant sent him to Dr. Greenwall, who prescribed a cervical collar and pain killers. Several weeks later, plaintiff placed himself under the care of Dr. Lester. Plaintiff was admitted to the North Little Rock Memorial Hospital and was X-rayed again. The X rays revealed a fracture of the fifth cervical vertebra; plaintiff was placed in traction and treated with physical therapy.

During the summer of 1977, plaintiff increasingly complained of pain in his neck and arm. Dr. Lester rehospitalized plaintiff for a bone scan and electromyographs; concurrently, Dr. Lester referred plaintiff to Dr. Fletcher, a specialist in neurosurgery. Dr. Fletcher examined plaintiff and found diminished reflex in the right side biceps, weakness in the right biceps and triceps, weakness and atrophy in the deltoid muscle, and restricted neck movement. Dr. Fletcher ordered a myelogram and tomograms, which revealed that plaintiff had sustained a compression fracture with flexion deformity and facet dislocation, in turn causing nerve root compression at the fifth cervical vertebra. After Drs. Fletcher and Lester performed a spinal fusion in

November of 1977, plaintiff was required to wear a brace for about six months.

On February 15, 1978, plaintiff first complained to Dr. Lester of pain in the left hip, and a few months later, he again complained of hip pain. Dr. Lester testified that he initially believed that the problem was not serious, and he hoped that physical therapy would alleviate it. Plaintiff returned to work for 19 days in early 1979, but stopped again, complaining of pronounced pain in the lower back and left hip, and stiffness in the neck. Dr. Lester stated that a series of tests indicated plaintiff suffered from a degenerative hip condition called "avuscular necrosis," which would ultimately require replacement of plaintiff's left hip joint. Dr. Lester opined that the hip problem could have been caused by trauma from plaintiff's fall on March 25, 1977. He explained that the timing of the symptoms, the asymmetry of the condition and the progressive seriousness of the problem were all consistent with traumatic origin.

Plaintiff has a limp favoring his left hip, and his range of motion is severely limited in his hip and neck. As for his neck, plaintiff has almost no extension, one-quarter or one-third of normal lateral range, 15% lateral tilt, and limited flexion. Plaintiff suffers pain when he tries to exceed his limited range of motion, and he suffers chronic neck, shoulder, arm and lower back pain. Dr. Lester testified that plaintiff's condition would only worsen.

Dr. Stevens, a clinical psychologist, testified that plaintiff suffered from frustration, anxiety and depression as a result of chronic pain and inability to work. Dr. Stevens administered a series of work tolerance tests and concluded that plaintiff was vocationally disabled. He expected that plaintiff's disability would only increase.

Professor Arthur Dobbelaere, an economist, testified that the present cash value of plaintiff's wages and benefits, if he worked until age 65, amounted to $481,283, and if he worked until age 70, $664,025. On cross-examination, defense counsel asked a number of questions concerning general economic conditions in the transportation and construction businesses. This colloquy ensued:

"DEFENSE ATTORNEY: Professor, do you know what the trends are in the marine industry presently?

A. No.

Q. Whether there are any vessels that are laid up, in full operation or did you make any study of that nature?

A. No.

Q. That would—

PLAINTIFF'S ATTORNEY: This is going to be objected to.

This is assuming that Material Service is only involved in the towboat business. It's a multi-corporation involved—

THE COURT: Please don't make speeches. Objection is overruled."

On redirect, plaintiff's counsel asked whether Dobbelaere took into account that "Material Service at one time had been merged with General Dynamics." Defendant's objection to this question was overruled, but objection to a subsequent question was sustained.

Plaintiff's counsel made one other reference to defendant's corporate status. While questioning the captain of the Irving Crown, counsel asked whether the captain was a stockholder who received "the annual report from General Dynamics of which Material Service is a subsidiary." The trial court sustained objection to this question, and admonished the jury to disregard it.

Defendant called two witnesses. Dr. Marshall Matz examined plaintiff in 1979, at defendant's request, after plaintiff's surgery. He stated that plaintiff displayed normal strength and flexion, except in the neck and left hip, and that plaintiff revealed no neurological symptoms. In Dr. Matz' opinion, the history of plaintiff's hip problem was inconsistent with trauma, and plaintiff's pain, in the hip as well as the neck, was caused solely by arthritis. On cross-examination, Dr. Matz admitted that a person could go through life with arthritis but without a medical complaint; that trauma could aggravate a pre-existing condition such as arthritis; and that an "ability to work-trauma-inability to work" symptomology would be an important consideration in determining cause.

George Leithner testified that, as a marine surveyor, he investigated accidents to determine the nature, extent and cause of damages, and he surveyed ships for condition and value. Plaintiff challenged Leithner's expert qualifications, and in *voir dire* examination by plaintiff's counsel, Leithner admitted that he had no special knowledge concerning ladders and no special experience in designing ships or ladders. The trial court overruled plaintiff's objection and permitted Leithner to testify as an expert. Leithner stated that he inspected the Irving Crown, and in his opinion, the dual port side ladder arrangement was "a safe installation." He based his opinion on two facts: first, the ladder was well fixed and secure, and second, the ladder was reasonably fit for its intended purpose. On cross-examination, Leithner admitted that he took no standards (marine or otherwise) into account in forming his opinion of safety, and that he did not measure the distance from the pilot house to the ladder. He concluded the ladder was safe because it was firmly attached and because he was

able to climb up and down it without incident.

After closing arguments, the trial court instructed the jury, *inter alia*, concerning the parties' respective theories and burdens of proof, the issues in the case, and the verdict forms. Specifically with respect to verdict forms, the judge stated that if the jury found plaintiff's injury was proximately caused by defendant's negligence or the vessel's unseaworthiness and there was no contributory negligence on plaintiff's part, then they should use "Verdict Form A" (Illinois Pattern Jury Instruction (IPI), Civil, No. 45.01 (2d ed. 1971)); if they found no negligence on defendant's part nor unseaworthiness of defendant's vessel which proximately caused plaintiff's injury, then they should use "Verdict Form B" (IPI Civil 2d 45.01); and if they found that plaintiff's injury was proximately caused by a combination of defendant's negligence and plaintiff's contributory negligence, then they should use "Verdict Form C" (IPI Civil 2d A45.05 (Supp. 1981)). Verdict Form C provides for the reduction of damages in proportion to plaintiff's fault.

After deliberations, the jury returned its verdict in favor of plaintiff and against defendant in the amount of $1,250,000. Defendant filed a timely notice of appeal.

OPINION

Defendant first contends that judgment *n.o.v.* was warranted because the testimony of plaintiff's expert was incompetent, hence plaintiff presented no evidence of defendant's fault or the vessel's unseaworthiness. Defendant argues that the law does not impose absolute liability upon ship owners; rather it recognizes that seamen must use care and agility to cope with the hazardous conditions which exist even on seaworthy vessels. Defendant concludes the evidence established that plaintiff fell from a normal ship's ladder, and so defendant was entitled to judgment below and is entitled to reversal in this court.

■ Plaintiff advances two theories of liability: one statutory, the other based on general maritime law. The Jones Act provides a cause of action and a right to trial by jury for a seaman who is injured as a result of the negligence of the ship owner or any of the owner's agents. (See 46 U.S.C. sec. 688 (1976); *The Arizona v. Anelich* (1936), 298 U.S. 110, 118-19, 80 L. Ed. 1075, 1078, 56 S. Ct. 707, 709.) " 'Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.' " (*Ferguson v. Moore-McCormack*

*Lines, Inc.* (1957), 352 U.S. 521, 523, 1 L. Ed. 2d 511, 514, 77 S. Ct. 457, 458, quoting *Rogers v. Missouri Pacific R.R. Co.* (1957), 352 U.S. 500, 506, 1 L. Ed. 2d 493, 499, 77 S. Ct. 443, 448.) Independent of the ship owner's duty under the Jones Act to exercise reasonable care, the maritime doctrine of seaworthiness imposes upon the owner an absolute duty to furnish a vessel and appurtenances reasonably fit for their intended use. (*Mitchell v. Trawler Racer, Inc.* (1960), 362 U.S. 539, 549-50, 4 L. Ed. 2d 941, 948, 80 S. Ct. 926, 932-33.) If plaintiff has made out a case on either theory, negligence or unseaworthiness, he must prevail on appeal. See Ill. Rev. Stat. 1983, ch. 110, par. 2—1201(d).

The thrust of defendant's argument is that plaintiff's expert was unqualified and his testimony concerning standards for fixed ladders was irrelevant. Defendant reasons that we must reverse because the jury's verdict could only have been based upon this incompetent evidence. We reject the premises and conclusion of defendant's argument.

■ In order to be admitted into evidence, expert testimony must assist the trier of fact in understanding the evidence or deciding a fact in issue, and the witness must be qualified by reason of knowledge, skill, experience, training or education to give such testimony. (See Cleary & Graham's Handbook of Illinois Evidence secs. 702.1, 702.2 (4th ed. 1984), and cases cited therein.) It is settled that the sufficiency of a witness' qualifications to testify as an expert is committed to the sound discretion of the trial court. (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250, 302 N.E.2d 257.) We hold that the trial court did not abuse its discretion in permitting McLean to testify as an expert in the present case. McLean, an engineer, has designed hundreds of installations, all of which included fixed ladders; he designed and manufactured equipment for the Navy, and he claimed knowledge of ladders commonly found aboard seagoing vessels. McLean's training, experience and knowledge indicated that his testimony would be useful to the jury in understanding the physical relationships involved in the incident.

We are unpersuaded by defendant's argument that McLean was unqualified because he had not designed ladders for seagoing vessels. We note that defendant's expert Leithner had no design experience whatever, nor had he any training in the mechanical sciences. The parties cross-examined one another's experts, and the jury had ample basis for assessing the credibility of the witnesses. We note, too, that defendant did not challenge McLean's qualifications at trial as plaintiff challenged those of Leithner; instead, defendant objected to Mc-

Lean's opinion on the general grounds of "foundation," and chose to delay specifying its challenge until the jury had rendered its verdict.

■ With respect to evidence of standards, we find defendant's contentions to be meritless, and we hold that such evidence was properly admitted in this case. Our supreme court held that standards were relevant and admissible in *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809, a negligence case. The court stated that standards served the same function as evidence of custom, helpful to indicate what was feasible or what the defendant knew or should have known, and in turn helpful to the jury in setting the applicable standard of care. (49 Ill. 2d 118, 125.) Similarly, our supreme court held in *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534, that standards were relevant in determining whether a condition constituted an unreasonably dangerous defect. (77 Ill. 2d 434, 438.) Here, the jury was called upon to decide whether defendant was negligent in furnishing the ladder in question, or whether the ladder itself was defective. The jury was further called upon to decide whether such negligence or defective condition proximately caused plaintiff's injuries. McLean posited that the American National Standards Institute promulgated safety standards for fixed ladders, that the standards applied to fixed ladders aboard defendant's vessel, and that the ladder from which plaintiff fell did not conform to the standards. McLean explained how the standards promoted balance and safety, and how the subject ladder defeated those purposes. Manifestly, his testimony assisted the jury in determining the standard of care and the condition of the dual ladder arrangement.

Defendant asserts that the ANSI standards do not apply to seagoing vessels. Our supreme court rejected a similar argument in *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809. There, the defendant argued that certain standards were not admissible because they had not been adopted by the appropriate governing agency. The court merely remarked that a "whole calling" may lag in adopting safety standards, and that the law ultimately decides what is required. (49 Ill. 2d 118, 125.) In this case, defendant's expert stated that he was not aware of ANSI or any other standards having been applied to ships. Clearly, this statement was not conclusive of either defendant's standard of care or the condition of the ladder. Defendant suggests no principled reason that safety standards should apply to fixed ladders on land, but not to fixed ladders at sea. Plaintiff's expert testified that the ANSI standards applied, and the standards themselves indicate that they are gen-

erally applicable. In fact, the standards provide for exceptions under "special service conditions," so long as "equivalent safety" is assured. Defendant attempted to show at trial that space limitations aboard the Irving Crown prevented the installation of a conforming ladder, but the jury apparently rejected this argument. The jury heard conflicting evidence concerning safety standards, and we will not disturb the jury's verdict. *Cf. Pell v. Victor J. Andrew High School* (1984), 123 Ill. App. 3d 423, 433, 462 N.E.2d 858; *Bishop v. Crowther* (1980), 92 Ill. App. 3d 1, 13, 415 N.E.2d 599.

The record indicates that when ANSI was formed in 1970, it adopted pre-existing standards for fixed ladders. Defendant deduces that there is no evidence of the standard applicable when the ship was built in 1952. In *Murphy v. Messerschmidt* (1977), 68 Ill. 2d 79, 368 N.E.2d 1299, relied upon by defendant, the court found error in the introduction of a 1963 building code to show custom and practice in the construction industry in 1952. The *Murphy* court distinguished *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93, on the ground that in *Davis*, the regulation was intended to eliminate existing hazards, whereas in *Murphy*, no such inference could be drawn from the record. (68 Ill. 2d 79, 84, 368 N.E.2d 1299.) In the instant case, the ANSI standards were placed in evidence, and the standards address existing hazards:

> "The requirements of this standard shall not apply to existing installations, provided they meet one of the following conditions:
>
> 1) The installation was made in compliance with a state, federal or consensus standard which was in existence and applicable at the time of the installation, and documentation is available to substantiate this.
>
> 2) The installation differs from the design measurements of this standard by a degree, determined by a competent structural engineer, which will not substantially change the performance requirements of this standard."

We conclude that this case is governed by *Davis* rather than *Murphy*, and hold that the ANSI standards were properly considered by the jury.

Defendant maintains that the ladder in question was "normal," and relies on *Cumberland v. Isthmian Lines, Inc.* (E.D. La. 1967), 282 F. Supp. 217, and *Bilger v. Maritime Overseas Corp.* (N.D. Cal. 1969), 304 F. Supp. 1024, *aff'd* (9th Cir. 1971), 439 F.2d 707, for the proposition that a seaman may not recover for a fall from "normal" equipment. *Cumberland* and *Bilger* are inapposite: both cases were

tried to the bench, and in each, the district court found as a factual matter that the defendant was not negligent and the plaintiff was entirely responsible for the injury. Here, plaintiff and defendant presented their cases to a jury, and the jury resolved the facts against defendant.

■ Finally with respect to the proofs of this case, defendant argues that there is no evidence that the nonconforming ladder proximately caused plaintiff's injury. A "cause" by its nature is not observed but inferred. Proximate cause is ordinarily a question of fact for the jury (*Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 84, 117 N.E.2d 74), and "[i]t is well established that the role of the jury is significantly greater in Jones Act *** cases than in common law negligence actions. The right of the jury to pass upon the question of fault and causation must be most liberally viewed." (*Johannessen v. Gulf Trading & Transportation Co.* (2d Cir. 1980), 633 F.2d 653, 656.) Plaintiff's expert testified that the ladder was too narrow and too shallow to provide proper balance; plaintiff testified that he fell when he removed his right foot from the wider, deeper part of the ladder. From this, the jury could, and apparently did, infer that plaintiff fell because he shifted his weight onto an improperly balanced foot, and that plaintiff's foot was not properly balanced because defendant furnished a narrow, shallow ladder. These inferences are supported by evidence and common sense, and the law does not permit us to nullify the jury's decision.

■■ Defendant next contends that the jury's verdict for $1,250,000 was excessive, and argues that the verdict was based on improper consideration of defendant's corporate status, repeatedly injected into the trial by plaintiff's counsel. Plaintiff rejoins that the verdict, while high, is reasonable in light of plaintiff's lost earnings, permanent disability and chronic pain and suffering. Plaintiff notes that the trial court permitted only one reference to defendant's corporate status, and argues that the reference was an invited response to defendant's suggestion that economic conditions would cause plaintiff to be laid off.

Emphasis on a defendant's corporate nature is improper because it tends to distract the jury from the real issues in the case and tends to evoke any prejudice the jury might harbor against corporations generally. (*Babcock v. Chesapeake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 932, 404 N.E.2d 265.) However, a reference to corporate wealth does not require that the verdict be set aside if it appears that no actual prejudice resulted. (See *Dupay v. New York Central R.R. Co.* (1969), 110 Ill. App. 2d 146, 154-55, 249 N.E.2d 179.) On appeal,

the question is not whether the trial was error free, but whether error occurred which prejudiced the appellant or unduly affected the outcome. (*Bruske v. Arnold* (1969), 44 Ill. 2d 132, 139, 254 N.E.2d 453, *cert. denied* (1970), 398 U.S. 905, 26 L. Ed. 2d 65, 90 S. Ct. 1697.) We do not believe that the references at issue rose to the level of reversible error.

Initially, we express our disapproval of the tactic which gave use to this "issue." Defendant cross-examined plaintiff's economist at length concerning trends in the transportation and construction industries, and our reading of the record reveals the clear implication that plaintiff's future earnings would be adversely affected by depressed economic conditions. Arguably, defendant thereby placed in issue the effects of depressed conditions on Material Service Corporation. Plaintiff's reference to defendant's parent corporation was therefore arguably relevant to defendant's ability to withstand depressed conditions in the transportation sector of the economy. However, no witness ever testified to any of this; plaintiff's economist had no knowledge of economic conditions in the transportation sector, let alone their effects upon particular companies, vessels and seamen. The attorneys for both sides fabricated this "issue" by "testifying" through their questions. The trial court instructed the jury to consider only the testimony of witnesses, and we assume that the jurors disregarded the attorneys' rhetoric.

For several additional reasons, we believe that the references at issue did not unduly prejudice defendant. Objections were sustained as to three out of four of the references. Plaintiff's counsel made no attempt at inflammatory argument based on either corporate status or wealth. Indeed, the last reference of which defendant complains occurred five days before the case went to the jury. The trial court instructed the jury that a corporation deserved the same fair treatment as an individual, and again, we assume that the jury followed instructions. Finally, the trial judge was in a better position to assess prejudicial impact upon the jury (see *Panelle v. Chicago Transit Authority* (1964), 31 Ill. 2d 560, 562, 202 N.E.2d 484), and he denied defendant's post-trial motion based on these references, stating that he doubted the jury perceived a great difference between Material Service and General Dynamics, and he felt the issue had negligible impact.

■ As to the verdict, we cannot say that it is excessive. The test for an excessive verdict is whether it falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1030, 343 N.E.2d 65.) The

propriety of an award of damages for personal injuries is not subject to mathematical computation, nor may it be measured by comparison with verdicts in other cases. "Each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury in making its determination and to the ruling of the trial judge on the post-trial motions." *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 453, 158 N.E.2d 63.

From the evidence in this case, the jury could infer that plaintiff would suffer total lost earnings between $481,000 and $664,000. The evidence indicates that plaintiff is permanently and progressively disabled, for which he is entitled to compensation independent of lost earnings. Medical testimony indicated that plaintiff suffers chronic pain which will increase until he dies. Plaintiff must undergo further surgery and periodic therapy, yet his full range of motion will never be restored. As a result of chronic pain and inability to work, plaintiff is frustrated and depressed to the point of interference with his family relationships. The jury felt that $1,250,000 would compensate plaintiff for his loss, and the sum does not shock this court's conscience.

■ Finally, defendant contends that the trial court erred in submitting three verdict forms to the jury. Defendant maintains that only the comparative negligence form was appropriate, and that tendering a general verdict form in favor of plaintiff encouraged the jury not to apportion fault between the parties. We do not believe that any reversible error occurred.

In *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, our supreme court adopted pure comparative negligence as the law of Illinois, and expressed its belief "that the use of special verdicts and special interrogatories will serve as a guide to assist the jury in its deliberations." (85 Ill. 2d 1, 28, 421 N.E.2d 886.) The Illinois Supreme Court Committee on Jury Instructions in Civil Cases drafted the "A" series of instructions to meet the need for a useable set of common law comparative negligence instructions. Recognizing the supreme court's desire to guide the jury in apportioning fault, the Committee commented that "the form of general verdict presently in use is still appropriate (A45.09) ***." (IPI Civil 2d Introduction, at 5 (Supp. 1981).) It is significant that the general verdict form endorsed by Committee is substantially the same as the form tendered to the jury in this case. (Compare IPI Civil 2d A45.09 (Supp. 1981) and IPI Civil 2d 45.01.) A number of cases have considered varying combinations of verdict forms, and we believe these cases point to a conclusion contrary to the one suggested by defendant.

In *Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 443 N.E.2d 774, the trial court submitted only the comparative negligence form and plaintiff argued that the court should have submitted the general verdict form as well. This court held that additional forms were not necessary. (111 Ill. App. 3d 169, 178.) There is nothing in *Hunter* which prohibits or even criticizes general verdict forms, and so the reliance of the present defendant upon *Hunter* is misplaced. *Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 444 N.E.2d 1113, addressed the converse problem. There, the defendant tendered special verdict forms, but the trial court submitted general forms instead. Noting that the language in *Alvis* concerning verdict forms was advisory, the *Stromquist* court affirmed. In *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199, the trial court submitted a comparative verdict form and a general form for plaintiff (IPI Civil 2d A45.05, A45.09), resulting in a combination of forms similar to the combination challenged in the instant case. The *Hazelwood* court found no error. (114 Ill. App. 3d 703, 709.) See also *Coleman v. Hermann* (1983), 116 Ill. App. 3d 448, 454-56, 452 N.E.2d 620; *Harris v. Day* (1983), 115 Ill. App. 3d 762, 773, 451 N.E.2d 262; *Seward v. Griffin* (1983), 116 Ill. App. 3d 749, 755, 452 N.E.2d 558.

In our view, these decisions are fundamentally harmonious. The jury instructions in each case properly guided the jury's deliberations concerning the apportionment of fault, and the verdict forms covered the possible findings. Other jurisdictions require computational instruction forms (see, *e.g., Lawrence v. Florida East Coast Ry. Co.* (Fla. 1977), 346 So. 2d 1012), but this court has recognized that substance should prevail over form. We believe that this flexible approach was foreseen by our supreme court in *Alvis*.

In this case, the trial court gave pattern instructions concerning theories of the case, burdens of proof, and issues. The court submitted a verdict form for plaintiff, one for defendant, and a form for comparative negligence. The instructions recognized the conflicts in the evidence and the verdict forms fairly covered any possible resolution of the issues. We hold that no error occurred. Defendant's only suggestion of prejudice is that submission of the form for plaintiff "encouraged" the jury not to apportion fault, but we fail to see how. The most that can be argued is that the verdict forms were duplicative, and assuming, *arguendo,* that they were, we would hold the duplication to be harmless to defendant.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

MEJDA, P.J., concurs.

JUSTICE SULLIVAN, dissenting:
For several reasons I am in disagreement with the majority concerning certain aspects of its opinion.

First, it appears to me that it has not been established that the American National Standards Institute (ANSI) standards were applicable to the seagoing vessel involved here (a river towboat). The only evidence in this regard came from McLean—plaintiff's expert witness—who gave opinions over objections that the standards applied to seagoing vessels and that the ladders in question here were unsafe because they failed to meet three of the ANSI standards for fixed ladders. However, the record discloses that McLean was an industrial engineer who, while having considerable experience in the design and construction of industrial plants and some experience with fixed ladders in such plants, had no experience or training in the design or construction of fixed ladders on river towboats or any other seagoing vessels. In fact, McLean admitted that his only knowledge concerning such fixed ladders was from visual observation of them. Moreover, from McLean's testimony, it appears that the ANSI standards for fixed ladders apply only to industrial usage. He testified that the ANSI was "a group of people who have collected these various standards from industry. *** They simply have codified under one group that is known as the American National Standards Group all of the standards that are used in industry today, and they have been very active since about 1970." On another occasion, he testified that ANSI was formed "to coordinate all of the several standards that have been adopted in industry generally," and although plaintiff argues that McLean was qualified to give the opinions in question on the basis that he had extensive experience in marine engineering, it is noted that he had never been involved in the design or construction of any seagoing vessel and, as noted above, his only knowledge concerning fixed ladders on seagoing vessels was his visual observation of them. It thus is my belief that foundation for McLean's opinions was lacking and that the objections thereto should have been sustained.

Secondly, even if the American standards were applicable to seagoing vessels, it is clear that they did not become effective until 1970, and there is nothing in the testimony of McLean or elsewhere in the record indicating that they applied to a seagoing vessel constructed in 1952, as was the case here. McLean did testify that in 1970, when

ANSI was created, it adopted the American Standards Association recommendations for ladders, but he did not state what those recommendations were, when they were adopted or whether they applied to seagoing vessels, and particularly he did not state that they were in effect in 1952.

Thus, since there was no foundation for McLean's testimony that the ANSI standards were applicable to seagoing vessels and, further, because there is nothing in the record to support their applicability to a vessel constructed prior to 1970, the testimony concerning them should not have been admitted.

Thirdly, McLean's testimony as to the ANSI variances should not have been admitted for the further reason that there was no testimony from it or any other witness relating plaintiff's fall to any of these variances; namely, that the ladder was too narrow, that it was too close to the bulkhead, and that the ladder centerline was not in the middle of its width. The only testimony by plaintiff as to his fall was as follows: On direct examination, he said that while transferring over to the other ladder, "my right foot was coming on there and as I remember, I slipped then." Subsequently, on his direct examination, after plaintiff testified that in transferring to the other ladder he put his left foot down first and then put his right foot up, his attorney then asked, "When you put your right foot up, I take it you put it on one of the rungs?" and he answered, "Yes." The next question asked by his counsel was, "How did that feel?" and he answered, "Well I guess slippery. I slipped." Thereafter, on cross-examination, when asked what happened when he was trying to swing over with his right foot, he answered, "My right foot, apparently slipped and my hand too, whatever. I don't know exactly." Thus, it appears clear that the only reason plaintiff gave for falling was that his foot slipped because the rung was slippery, and there thus is nothing in his or any other testimony that any of the ANSI variances testified to by McLean was a proximate cause of his fall.

While, as stated by the majority, citing *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 79, 117 N.E.2d 74, 78, proximate cause is ordinarily a question of fact for the jury, the court in *Ney*, which involved a statutory violation, also pointed out that "[t]he injury must have a direct and proximate connection with the violation of the statute before liability will be held to exist." The same rule, of course, would apply to ANSI variances, and because there was no testimony connecting plaintiff's injury to any of the variances, the admission of McLean's opinion concerning them was erroneous.

Because plaintiff's counsel argued at length, in closing arguments,

that defendant was negligent and the vessel in question unseaworthy because of the variances and that at least one of them was a proximate cause of his injuries, it is my belief that defendant was so prejudiced by the improper admission of McLean's testimony concerning the variances that a new trial is required.

I also disagree with the majority concerning the propriety of the verdict forms submitted to the jury. As stated by the majority, the trial court informed the jury that they should use "Verdict Form A" (IPI Civil 2d No. 45.01) if they found no contributory negligence; but, if they found there was a combination of negligence and contributory negligence, they should use "Verdict Form C"[1] (IPI Civil 2d No. A45.06 (Supp. 1981).) "A" is as follows: "We, the Jury, find for the plaintiff and against the defendant. We assess the damages in the sum of $___." The first three paragraphs of "C" read as follows:

"We, the jury, find for the plaintiff and against all of the defendant(s) and further find the following:

First: Without taking into consideration the question of reduction of damages due to the negligence of the plaintiff, *** [we assess plaintiff's damages in the sum of] $___.

Second: Assuming that 100% represents the total combined negligence of the plaintiff and of the defendant(s) [or the unseaworthiness of defendant's vessel,] we find that the percentage of negligence *** attributable solely to the plaintiff is ___ percent (%).

Third: After reducing the total damages sustained by the plaintiff by the percentage of negligence attributable to the plaintiff, we assess plaintiff's recoverable damages in the sum of $___."

In *Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 443 N.E.2d 774, where "C" was given, plaintiff asserted error because IPI Civil 2d No. A45.09 (which is the equivalent of "A") was not given. The court found that the giving of "C" was appropriate whenever the negligence of plaintiff was an issue, and under such circumstances there was no need to give "A".

In the cases cited by plaintiff and relied upon by the majority, the propriety of giving those two verdict forms was neither at issue nor discussed. In *Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 444 N.E.2d 1113, the trial court refused a special verdict form but gave a general verdict form to the jury. Neither was identi-

---

[1]"Verdict Form B" was the second half of IPI Civil 2d No. 45.01 providing for a finding for defendant and against plaintiff.

fied as to content in the opinion. This court found that the special verdict form was properly refused because it was defective, and held that the use of a general verdict form was proper where it adequately charges the jury. In *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199, defendant alleged error in the refusal of a non-IPI computational comparative negligence verdict form. Given were IPI Civil 2d No. A45.05 (1981 Supp.) (outlining how to reduce damages if there is contributory negligence) and a modified IPI general verdict form (IPI Civil 2d No. A45.09 (Supp. 1981)) (not set forth in the opinions). This court, noting that defendant did not object to either of them, found that the refusal of the non-IPI computational form was not error since the combination of IPI A45.05 and the modified IPI A45.09 was adequate for the jury to reach a verdict. In *Coleman v. Hermann* (1983), 116 Ill. App. 3d 448, 452 N.E.2d 620, the trial court refused plaintiff's general verdict form (IPI Civil 2d No. A45.09 (Supp. 1981)), and gave defendant's non-IPI special verdict form, which set forth five separate issues, each calling for a yes or no answer by the jury. At issue was whether defendant's instruction violated section 2—1108 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1108). This court found that under the circumstances of the case, the verdict form as submitted was error, but held it to be harmless because there was no prejudice to plaintiff since under the circumstances there, "the submission of what was, in form, a special verdict but, in substance, a general verdict" satisfied the requirement of section 2—1108, that the jury "shall render a general verdict."

The problem I see in the instant case is that "A" and "C" are both general verdict forms in that each provides for a finding in favor of plaintiff and the assessment of damages against defendant. A finding for plaintiff would be accomplished in "C" by the jury's use of "zero" as the percentage of negligence attributable to plaintiff. The submission of two such general verdict forms, each allowing the assessment of full damages against defendant, is improper and, adhering to the reasoning in *Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 443 N.E.2d 774, I believe where—as here—plaintiff's negligence was in issue, that only "C" (IPI Civil 2d No. A45.06), should have been given; but not "A", which was IPI Civil 2d No. A45.01. As stated in the "Notes on Use" under IPI Civil 2d No. A45.06, at 37 (1981 Supp.), "[w]here there is no issue of plaintiff's contributory negligence, IPI 45.01 or 45.03 should be used."

For the reasons stated, I would reverse the judgment of the circuit court and remand for a new trial.